72 N.J. Super. 252 (1962)
178 A.2d 213
ISAAC PIERCE, JR., PLAINTIFF-RESPONDENT,
v.
LOUIS YACCARINO, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 29, 1962.
Decided February 15, 1962.
*254 Before Judges CONFORD, GAULKIN and KILKENNY.
Mr. Patrick J. McGann, Jr., argued the cause for appellant (Messrs. Reussille, Cornwell, Mausner & Carotenuto, attorneys).
Mr. Benjamin Edelstein argued the cause for respondent (Messrs. Edelstein & Edelstein, attorneys).
The opinion of the court was delivered by GAULKIN, J.A.D.
This is a sad and unfortunately too common example of how a case should not be tried. Plaintiff's attorney said things he should not have said. Defense counsel (not present counsel) did not object to most of the utterances, and too late or insufficiently to the remainder. The trial judge took no action to curb or cure the improprieties. As a result, we must reverse for "plain errors" *255 under R.R. 1:5-3(c) a judgment which we would otherwise affirm.
The action is for malicious prosecution. Plaintiff Isaac Pierce, Jr. had purchased a second-hand automobile from defendant Yaccarino under a conditional sales contract. On or about January 1, 1957 the automobile, while parked unoccupied, was struck and damaged by a motorist insured by the General Accident Insurance Company (General). Even though he first obtained an estimate of $396.95 to repair the damage from another concern, plaintiff brought the damaged vehicle to defendant, who operated as Lou's Body Shop as well as Guaranteed Auto Sales, and left it with defendant to be repaired without an estimate or agreement as to price. Plaintiff testified he did so because when he purchased the car he was given a card by defendant stating that all repairs "must be done through Guaranteed Auto." Plaintiff testified that defendant told him he "would take care of the procedures" of settling with General and would repair the damage with the proceeds of the settlement.
Defendant submitted an estimate of $794.90 to General but later settled with that company for $456.55. Defendant expected General to send him the check or, at least, that he would be one of the payees, but, on January 22, 1958, General sent to the plaintiff a check to plaintiff's order alone for $456.55. Plaintiff knew that he was not insured by General but by another company he called "Globe." Therefore he took the check to someone he called "Seymour Sales" (not connected with anyone else mentioned in this opinion) and asked "what it was and they told [him] what it was." Plaintiff then cashed the check.
On January 29 plaintiff came to defendant's place of business in Neptune for the car. Defendant told plaintiff that the car was at Chris's Body Shop, in Long Branch. He gave plaintiff a check for $125 to the order of Chris's Body Shop and told plaintiff he could pick up the car there. When plaintiff did so he found that not all the *256 damage had been repaired. Indeed, plaintiff's attorney contended at the trial that the $125 paid to Chris's Body Shop represented the value of all the repairs done on the car and that defendant had expended no more than that sum on it, in spite of the fact that defendant planned to get $456.55 from General.
Plaintiff returned with the car to defendant's place of business and complained to him about the insufficiency of the repairs. Plaintiff testified that he told defendant he did not want the car "because it wasn't properly fixed" and that he asked for another car of the same make and year which defendant had in his yard. Plaintiff said that when defendant refused, saying that all that was needed was "just a few minor adjustments," he asked defendant what he owed him for the repairs, and that defendant answered "that's all right the insurance company will take care of it." Plaintiff then departed with his car. He admits he did not tell defendant that he had already received and cashed the check. He claims that he knew nothing of the amount or details of the settlement with General and believed defendant's statement that the insurance company would pay defendant.
Defendant's version of the surrender of the automobile is quite different. He testified that "Mr. Pierce asked me for the automobile and I explained to him the bill was $456 and I do not release an automobile unless I get paid. He asked me if I would be nice enough to let him have it, he had to go to work with the car and I explained again that I hadn't received the insurance check and I asked him if he had received it and he told me he had not and I asked him if he'd promise me if I gave him the car that he would bring it in as soon as he got [it] and he said he would and on the strength of that I gave him the car." Defendant testified that plaintiff's only complaint as to the repairs was that "the deck lid was not closing properly" and that he told plaintiff "if he would leave the car the following day we'd have the adjustment taken care of."
*257 Plaintiff did not come back with the automobile. Defendant testified that about a week or ten days after January 29, the day plaintiff departed with the car, he learned that plaintiff had received and cashed the check. He testified that he did not make the complaint until after trying "very hard" to locate plaintiff in Neptune. The complaint was made on February 24, 1958, and plaintiff was arrested on that day.
The complaint was inartistically drawn and it is difficult to determine precisely what crime or crimes (if any) it charged. Plaintiff claims it charged forgery; defendant denies it, and argues it charged only the obtaining of possession of the car by means of false promises or pretenses, contrary to N.J.S. 2A:111-1. As we have said, the check issued by General was dated January 22, but the car was not taken by plaintiff until January 29. The complaint charged that on January 22 plaintiff did "commit a fraud" upon Yaccarino "to wit: the defendant had repairs completed upon his motor vehicle * * * incurring a bill of Four hundred and fifty six dollars and fifty five cents ($456.55) and the defendant did thereupon cash a check made out for these repairs by the American Casualty Group of Philadelphia, Pennsylvania for this amount, said check being issued to Isaac Pierce, Jr. & Lou's Body Shop, and did fail to pay the complainant for the work completed by the complainant, thereby depriving the complainant of his rightful goods and chattels, all of which is contrary to and in violation of the R.S. of the State of New Jersey and therefore he prays that the said Isaac Pierce Jr. may be apprehended and held to answer to said complaint, and dealt with as the law and justice may require."
Plaintiff was released on bail on February 25, the day after his arrest. On March 4 he was given a preliminary hearing before the Neptune acting magistrate. At that time defendant, having learned that the check was payable to Pierce alone, withdrew the allegation of the complaint that Pierce had cashed a check "issued to Isaac Pierce Jr. *258 and Lou's Body Shop," but the acting magistrate (as he testified) "held Mr. Pierce for the grand jury on the grounds of false pretenses." The record before us does not show what Yaccarino's testimony was before the magistrate.
The grand jury handed down an indictment which purported to charge Pierce with violating N.J.S. 2A:111-1 in that he did "falsely represent, pretend and promise to the said Louis Yaccarino that he * * * would pay over to the said Louis Yaccarino" the check, and thus obtained the car. On January 28, 1959 defendant was arrested on this indictment. This time he was in jail until February 2, when he was released on bail. In May he was tried on the indictment, and acquitted after a two-day trial. The present action was then instituted. It resulted in an award of $4,505 compensatory and $3,000 punitive damages. Defendant's motion for a new trial was denied and this appeal followed.
Throughout the trial plaintiff's attorney endeavored to project the image of plaintiff as an uneducated Negro at the mercy of defendant; that defendant schemed to get as much as possible from the insurance company while giving plaintiff as little as possible in repairs; and that, angry when defendant's scheme was thwarted by General's mailing the check to plaintiff, defendant instituted the criminal proceedings to force plaintiff to give him the $456.55 when the repairs were worth only $125.
At the very end of a long cross-examination of Yaccarino along these lines, the following transpired:
"Recross-examination by Mr. Edelstein:
Q. Mr. Yaccarino, a great part of your business is done with Negroes, is it not? A. Yes.
Mr. Edelstein: That's all."
There was no objection by defendant's attorney and no action by the judge.
Counsel agree that one juror was a Negro. The quoted question obviously was intended to give the jury the impression *259 that defendant was in the business of cheating ignorant Negroes.
Plaintiff's attorney does not suggest any other reason for asking it, or what else it could have meant to the jury. He does not argue that it was a proper question, but asks to be excused on the ground that the question was put in the heat of his examination. First of all, that is no excuse for so shocking a question. Secondly, he returned to the same attack in his summation the following day. He said:
"I want you also to consider the fact that Mr. Yaccarino, the fact that he admitted, the last thing he testified to on the stand, does the bulk of his business with negroes. Now, I don't have to point out to you the fact, the advantages and disadvantages that one has over the other. You are all over the age 21 and you have been in the world long enough to know the facts of life. * * *"
Again there was no objection from defendant's attorney and no action by the court.
It is the obligation of counsel to make timely objection, and ordinarily the trial court will not interfere with the lawyer's judgment of whether an objection is necessary or desirable. However, there are limits to such laissez faire. As we said in Purpura v. Public Service Elec. & Gas Co., 53 N.J. Super. 475, 480 (App. Div. 1959):
"`Courts exist for the judicial determination of the rights of the litigants and for the administration of justice, and it is the duty of those presiding, as far as humanly possible, to see that the setting of each individual case shall be such that an impartial and just deliverance shall be had between the parties, and when counsel deliberately seeks to inject into a cause an element which has, and is designed to have, the effect of prejudicing the rights of one or the other of the litigants, it is the duty of the judge to guard against such effect, either by arresting the trial in limine * * * or by guarding against the pernicious results through proper instruction to the jury * * *.'
We appreciate the fact that a trial judge may be reluctant to take a greater part in the trial of a case than is absolutely necessary. Nevertheless, as the court said in Martin v. State, 63 Miss. 505, 56 Amer. Rep. 812, 813 (1886):
`* * * It is among the highest of judicial functions to see that the law is impartially administered and to guard the jury box as far as possible from unlawful influences. * * *
*260 It may sometimes be a difficult and delicate duty for the court to confine counsel to legitimate argument, but this is no reason why it should not be done when necessary to prevent the perversion of law and justice. Like other difficult and delicate duties, it should not be shunned or disregarded by those upon whom it is imposed. Justice should not be sacrificed on mere sentiments of delicacy. * * *.'"
See also Greenberg v. Stanley, 30 N.J. 485, 503 (1959); Paxton v. Misiuk, 54 N.J. Super. 15, 22 (App. Div. 1959); Haid v. Loderstedt, 45 N.J. Super. 547 (App. Div. 1957).
Another serious impropriety arose in the following fashion. In cross-examining defendant's witness Addeo, plaintiff's attorney asked him whether he had "gone over" his testimony with defendant and Addeo answered "No." The cross-examination then continued as follows:
"Q. Let me refresh your recollection. Isn't it a fact, Mr. Addeo, at 1:22 P.M. this afternoon you were walking down the street here in front of the Courthouse on Main Street and you asked Mr. Yaccarino a question as to your testimony and Mr. Yaccarino in a very loud voice answered, `If they ask you what happened tell them what happened, but only the important things.' You remember that? A. I don't.
Q. You don't remember that? A. No, I don't.
Q. You remember seeing me walk away from the Courthouse? A. I seen you walking a lot of times.
Q. I am talking about this afternoon. You didn't make this statement? A. No, I didn't.
Q. And Mr. Yaccarino didn't make that statement to you? A. Not to me.
Q. In front of the old Courthouse? A. I know where you are talking about.
Q. Next to the automobile supply place? A. He didn't make that statement to me. We weren't even talking about the case, if that's what you are talking about."
Plaintiff's attorney did not take the stand, nor did any other witness testify that the conversation described in Mr. Edelstein's question had in fact taken place. Therefore, in his summation defendant's attorney properly pointed out to the jury that merely because the question was asked did not prove that Yaccarino had made the alleged statement to Addeo, and, since Addeo's denial was uncontradicted, there was no proof that it had indeed been said.
*261 In his summation plaintiff's attorney replied by saying defendant's attorney "accused me of unethical conduct." When defendant's attorney protested that he had made no such accusation, plaintiff's attorney withdrew the statement, but immediately thereafter he said:
"Now, I was the only person there and Mr. Mattice knows that I couldn't get on the stand. I am trying this case. Now it is a question of whether or not I fabricated this testimony and there was no one there to corroborate it. If there had been, the person would have been on the stand. I wouldn't manufacture Mr. Pierce with me and say he heard it because he didn't. I walked down and I walked back alone. And I say to you that if I did that I would be subject to disbarment."
Again defense counsel did not object and the trial judge said nothing.
"Counsel should never in the course of argument state facts which are based on his own personal knowledge only, regardless of their relevancy to the issues at bar, but if he desires to get such facts before the jury, he should take the stand and present them in a legitimate manner." 53 Am. Jur., Trial, Sec. 483, p. 390.
Accord: Tabor v. O'Grady, 59 N.J. Super. 330, 340 (App. Div. 1960); Flynn v. Stearns, 52 N.J. Super. 115, 126 (App. Div. 1958); Kulodzej v. Lehigh Valley Railroad Co., 39 N.J. Super. 268, 273-274 (App. Div. 1956). See also Shafer v. H.B. Thomas Co., 53 N.J. Super. 19, 26 (App. Div. 1958).
Counsel is competent to testify if he insists upon doing so (Callen v. Gill, 7 N.J. 312, 317 (1951)), but the giving of testimony by trial counsel has been "under emphatic condemnation" for over 100 years (Roston v. Morris, 25 N.J.L. 173, 175 (Sup. Ct. 1855); Callen v. Gill, supra). Canon 19 of the Canons of Professional Ethics provides, "Except when essential to the ends of justice, a lawyer should avoid testifying in Court on behalf of his client." Therefore, unless it is important to do so and unavoidable, the wise trial attorney will not create an issue *262 of veracity between himself and a witness. First, it is unfair to the witness, for the jury looks upon the attorney with trust and respect because he is a member of an honored and learned profession, an officer of the court, and one of the commanding figures in the court room. Second, and as a consequence, when a witness disputes the attorney's veracity, it causes embarrassment not only to the attorney but to everyone in the courtroom. It casts doubt upon the integrity of the attorney and thus reflects upon the profession as a whole. "[Q]uestions of his own credibility and of the accuracy of his statements afford for * * * [the attorney] most indelicate questions for discussion." 58 Am. Jur., Witnesses, § 152, p. 110. See also Gershonowitz v. Neider, 95 N.J. Eq. 580, 582 (Ch. 1924). Finally, when the matter is too unimportant to justify his taking the stand to establish his truthfulness, the trial attorney must risk the chance that the jury will disbelieve him. He may not attempt to convince the jury of his veracity by declamation, argument or summation, as was done here.
The issue upon which counsel threw his veracity into the scales against that of Mr. Addeo was of slight importance. However the possible prejudicial effect of this episode was heightened by the court's inadequate charge on "falsus in uno," in which he failed to say that the falsehood must be as to a material fact. State v. Sturchio, 127 N.J.L. 366 (Sup. Ct. 1941); State v. Ernst, 32 N.J. 567, 583 (1960).
If the testimony in the guise of summation were the only transgression we would find it insufficient to justify reversal for plain error. However it did not stand alone. In addition to the reference to defendant's doing business with Negroes there were other and lesser improprieties  too numerous to discuss. In short, we are convinced that justice demands a new trial.
Defendant contends that plaintiff did not prove a case and that his motions for judgment should have been granted; and, therefore, that we should order the entry of judgment in favor of defendant. We find no merit in *263 this contention. Plaintiff's case was that defendant caused his arrest and imprisonment by falsely accusing him of cashing a check made out to defendant (which accusation defendant withdrew after the first arrest, having learned he was not a payee) and of obtaining the automobile by promising to give the defendant the check when it arrived, when in fact plaintiff had already cashed it. Defendant argues that he honestly believed the check had named him as a payee, and that such honest belief is a defense. However, it appears that defendant made no investigation, had no factual basis for the alleged belief, and merely assumed that the check had been so issued. Under these circumstances belief, however honest, is no defense. The jury was also entitled to find that defendant caused plaintiff's arrest on the indictment, and resultant damage, by charging plaintiff with falsely promising to turn over the check when he had already cashed it, and that no such promise had been made by Pierce.
Reversed for a new trial, costs to abide the event.