139 N.J. Super. 351 (1976)
354 A.2d 92
MARY G. BELINSKI, T/A TOPPER REALTY, PLAINTIFF-RESPONDENT,
v.
HOWARD GOODMAN, RONA GOODMAN AND 11TH AVE. 26TH CORP., A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANTS-APPELLANTS, AND IRVING TRUST COMPANY, A BANKING CORPORATION OF THE STATE OF NEW YORK, CHARLES M. YOUNG, CROSS-CLAIMANTS.
Superior Court of New Jersey, Appellate Division.
Submitted January 13, 1976.
Decided February 23, 1976.
*353 Before Judges MATTHEWS, LORA and MORGAN.
Messrs. Wilentz, Goldman & Spitzer, attorneys for appellants (Mr. Warren W. Wilentz, of counsel; Mr. Mark Rosenthal and Mr. Marvin Lehman on the brief).
Mr. Vincent F.X. Carlsen, attorney for respondent.
MORGAN, J.A.D.
This was an action for tortious interference with prospective economic advantage arising out of the negotiations for the sale of a parcel of realty consisting of a large home on five acres of land located in Alpine, Bergen County. Plaintiff, Mary Belinski, is a real estate broker trading as Topper Realty. The property belonged to the estate of Katherine Shaw-Kennedy, and was being held for sale by the Irving Trust Company (hereinafter the "bank"), coexecutor of the estate and a cross-claimant in this action, who gave plaintiff a nonexclusive authorization to sell this property.
In the spring of 1970 defendants Howard and Rona Goodman, husband and wife, consulted plaintiff with respect to locating suitable residential property in the Alpine area. Defendants became interested in the Shaw-Kennedy property and accordingly, plaintiff engaged in extensive negotiations with the bank on their behalf. At one point the parties reached agreement for a price of $275,000, but the sale was never consummated because of title problems with respect to part of the property. Negotiations nonetheless continued into the spring of 1971, with plaintiff acting as the sole broker.
In May 1971 defendants asked plaintiff to cut her commission. She agreed to accept $10,000 on the condition that *354 the money be deposited in a trust account immediately and held there until closing. Mr. Goodman apparently became angered at this request and soon thereafter informed plaintiff that he was no longer interested in the property.
At about the same time a man named Zuman (Mrs. Goodman's former husband) commenced negotiations with the bank on behalf of a corporation known as the "11th Ave. 26th Corp." with respect to the same property, advising the bank that the corporation was a "front" for a wealthy oil operator who wished to purchase the property for his mistress. Following execution of a contract of sale for $203,040 title was transferred to this corporate entity on September 23, 1971. Zuman received a commission of $9,500. Plaintiff soon discovered, however, that this corporation was a mere alter ego for the Goodmans and the sale to this corporation had the effect of depriving plaintiff of the commission to which she would have been entitled had the Goodmans taken title in their own names. The present suit was thereupon instituted and, following trial, a jury awarded plaintiff $25,000 against the Goodmans and the 11th Ave. 26th Corp. This judgment was appealed and the Appellate Division, in an unreported decision, affirmed the judgment as to liability but remanded the case for a new trial on the issue of damages only. Defendants' petition for certification was denied.
Following a new trial on the damage issue, the jury returned a verdict of $9,720 in compensatory damages and $20,000 punitive damages.[1] Defendants' motion for judgment n.o.v. or, in the alternative, for a new trial, was denied. Defendants objected to that part of the judgment which calculated prejudgment interest on the punitive damages awarded.
*355 Defendants' contention that there was insufficient evidence adduced to permit the jury to estimate the amount of compensatory damages with some reasonable degree of certainty is without merit. The compensatory damage award of $9,720 was not, as defendants contend, based upon mere speculation. The evidence disclosed that plaintiff's commission was agreed by her to be $10,000 and that Zuman received a $9,500 commission as broker for the sale of this very property to defendants. The jury could reasonably have concluded, based upon this evidence, that plaintiff's loss resulting from defendants' tortious conduct, was somewhere between those two figures.
If the evidence affords a basis for estimating the damages with some reasonable degree of certainty, it is sufficient * * * The rule relating to the uncertainty of damages applies to the uncertainty as to the fact of damage and not as to its amount, and where it is certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery * * * [Tessmar v. Grosner, 23 N.J. 193, 203 (1957); citations omitted]
See also, Betenbaugh v. Princeton Hospital, 50 N.J. 390, 393 (1967); Paolicelli v. Wojciechowski, 132 N.J. Super. 274, 278 (App. Div. 1975), certif. den. 68 N.J. 153, 154 (1975). Since we hold that sufficient evidence supports the award of compensatory damages, it becomes unnecessary for us to consider defendants' contention that an award of punitive damages cannot stand in absence of an award of compensatory damages.
Defendants next contend that improper remarks of plaintiff's counsel made during the course of summation influenced the jury's verdict as to the amount of damages. Defendants point to counsel's characterization of Mr. Goodman as a "man of suspicion" who employs devious ways to accomplish his ends, a "wheeler-dealer," a "schemer," a man with an "evil mind" with "no heart" and with "ice water where the blood should flow." The overall tenor of these remarks was a description of Goodman as a wealthy, ruthless, corrupt and immoral business man taking advantage of an *356 honest and hardworking realtor. Although defense counsel moved for a mistrial at the conclusion of this summation, the basis of this motion was the several references to defendant's financial status (about which more later), and thus the point of argument must be regarded as referring to plain error.
Defendants' reliance upon Paxton v. Misiuk, 54 N.J. Super. 15 (App. Div. 1959),[2] and Haid v. Loderstedt, 45 N.J. Super. 547 (App. Div. 1957), is inappropriate. Both were personal injury negligence cases in which counsel, during summation, made reference to matters not in issue. In Paxton the condemned remarks cast aspersions on the litigant's character which was not in issue. In Haid judgment for defendant was reversed because of defense counsel's remark which implied that defendant was not insured when in fact he was. Neither case concerned an award for punitive damages in which the degree of malice with which the tort was committed was relevant. Cf. Pierce v. Yaccarino, 72 N.J. Super. 252 (App. Div. 1962).
The claim for punitive damages in the present case made relevant the quality of defendants' motivation and intent with regard to the transaction in question. An act to give rise to punitive damages must be actuated by "`actual malice, which is nothing more or less than intentional wrongdoing  an evil-minded act * * *.'" Di Giovanni v. Pessel, 55 N.J. 188, 191 (1970).
* * * There must be circumstances of aggravation or outrage, such as spite or "malice," or a fraudulent or evil motive on the part of the defendant * * * [Id. at 190]
Hence, the evidence presented, which arguably showed defendant to be a man of low moral fibre with respect to the *357 transaction in question, and disclosed the wrongful motivation with which he undertook to accept title in a corporate name in order to deprive plaintiff of a commission, was relevant and reference thereto in summation was, therefore, not improper. The evidence, and the argument based thereon, bore on the degree of actual malice which attended his conduct and was therefore relevant to the amount of punitive damages appropriate in the case. No error, let alone plain error, has been shown.
Defendants next contend that prejudicial error occurred when plaintiff's counsel in summation referred to Goodman as a millionaire. The challenged remarks read as follows:
Do you realize what you have to earn to be able to keep over $300,000 with our taxes the way they are today, income taxes? That man's in the millionaire class. He earns millions of dollars. How do you punish a man like that? How do you punish him? You punish him where it hurts.
Shortly thereafter defense counsel moved for a mistrial because of these statements, and although the motion was denied, the trial judge did instruct the jury as follows:
You may recall that during summations Mr. Carlsen referred to Mr. Goodman as being in the millionaire class or [sic] and he argued that he earns millions of dollars a year. I'm striking that portion of Mr. Carlsen's argument and I instruct you to disregard that portion.
Notwithstanding this instruction, defendants argue that they were seriously prejudiced by counsel's remarks since they allege the absence of evidence establishing Goodman's status as a millionaire and that the curative instructions were insufficient to erase the harmful impressions left in the jurors' minds.
The actual wealth of a defendant is relevant on a claim of punitive damages and evidence thereof may be received following a prima facie showing of actual malice. Warren v. Hague, 11 N.J. Super. 311, 316 (App. Div. *358 1951); Gierman v. Toman, 77 N.J. Super. 18 (Law Div. 1962). Financial statements reflecting defendants' net worth were accordingly admitted during trial without objection. Such statements showed that as of December 15, 1970 defendants had a net worth of $507,100; as of June 15, 1971, their net worth was shown to be $893,500. While there was some element of exaggeration in the challenged remarks, plaintiff's counsel was not so wide of the mark as to require the drastic remedy of a new trial particularly since the jury had the financial statements themselves, and at any rate, were instructed by the trial judge to ignore the remarks. The denial of defendants' motion for a mistrial was not a mistaken exercise of discretion.
Finally, plaintiff urges as error the calculation of prejudgment interest on the punitive damages award. R. 4:42-11(b) provides as follows:
(b) Tort Actions. Except where provided by statute with respect to a public entity or employee, the court shall, in tort actions, including products liability actions, include in the judgment interest at 8% per annum on the amount of the award from the date of the institution of the action or from a date 6 months after the date of the tort, whichever is later, provided that in exceptional cases the court may suspend the running of such prejudgment interest. The contingent fee for an attorney shall not be computed on the interest so included in the judgment.[3]
The trial court in awarding prejudgment interest on the punitive damage award noted the absence of any express exception with regard to such damages in the otherwise broad terms of the rule and also noted the prohibition upon calculation of contingent fees on the amount of prejudgment interest included in an award. The absence of such an exception was viewed as indicative of the court's intent that prejudgment interest apply to punitive as well as to compensatory damages. Considerations of calendar control also motivated the ruling.
*359 The issue projected is one of novel impression in New Jersey. The prevailing rule in other jurisdictions, however, is that "interest is generally disallowed on punitive damages." See, e.g., Blake v. Grant, 65 Wash.2d 410, 397 P.2d 843, 845 (Sup. Ct. 1964); 22 Am. Jur.2d, § 264 and cases cited therein. While R. 4:42-11(b) does not expressly except punitive damage awards from its scope, the policy considerations which gave rise to its adoption suggest that result. Prejudgment interest is assessed on tort judgments because "the defendant has had the use, and the plaintiff has not, of moneys which the judgment finds was the damage plaintiff suffered." Busik v. Levine, 63 N.J. 351, 359 (1973), app. dism. 414 U.S. 1106, 94 S.Ct. 831, 38 L.Ed.2d 733 (1973). It is thus clearly implied that interest on the loss suffered by a plaintiff as a result of defendant's tortious conduct is what was contemplated by the rule.
* * * Interest is not punitive * * *; here it is compensatory, to indemnify the claimant for the loss of what the moneys due him would presumably have earned if payment had not been delayed * * * [Id. at 358]
An award of punitive damages, by its own terms, is punitive in nature and purpose and the award of interest thereon no less so. Such damages do not compensate plaintiff for a loss sustained; their purpose is to punish a defendant for wrongful, malicious conduct and as a deterrent to such conduct in the future. Cabakov v. Thatcher, 37 N.J. Super. 249 (App. Div. 1955). Moreover, the considerations of calendar control which partially underlay adoption of the rule related to the "major demand" of tort litigation on court facilities.
* * * Delay in the disposition of those cases has an impact upon other litigants who wait for their turn, and upon the taxpayers who support the system. And here there is a special inducement for delay, since generally the claims are covered by liability insurance, and when payment is delayed, the carrier receives income from a portion of the premiums on hand set aside as a reserve for pending claims. [Busik v. Levine, supra 63 N.J. at 359]
*360 Parenthetically, punitive damage awards in these circumstances are not ordinarily insured against, and in this case no insurance is involved. LoRocco v. N.J. Mfrs. Ind. Ins. Co., 82 N.J. Super. 323, 332 (App. Div. 1964), certif. den. 42 N.J. 144 (1964). Claims of the present nature involving the award of punitive damages do not, however, constitute a major demand on our court system and are therefore foreign to one of the underlying considerations which resulted in adoption of the prejudgment interest rule.
We therefore conclude, in accordance with the prevailing view in other jurisdictions, that prejudgment interest was not intended by R. 4:42-11(b) to have application to awards of punitive damages and that the trial court was in error in ruling otherwise.
Affirmed as modified.
NOTES
[1] Damages of $6,887 were also allowed in favor of the cross-claimant bank and Charles M. Young but this award is not the subject of this appeal.
[2] The case was retried as a result of this decision. An appeal was thereafter taken but was dismissed by the Appellate Division. After granting certification, the Supreme Court affirmed the judgment of the trial court. Paxton v. Misiuk, 34 N.J. 453 (1961).
[3] The specified interest rate was raised from 6% to 8% on April 1, 1975.