257 N.J. Super. 533 (1992)
608 A.2d 978
SANDRA HERMAN, PLAINTIFF-RESPONDENT, AND ROBERT HERMAN, HER HUSBAND, PLAINTIFF,
v.
SUNSHINE CHEMICAL SPECIALTIES, INC., A N.J. CORP., CONCORD HARLEY CORP., A/K/A CONCORD CHEMICAL COMPANY, INC., A/K/A HARLEY CHEMICAL CORP., A DIVISION OF CONCORD CHEMICAL COMPANY, INC., DEFENDANTS. PARKER, MCCAY & CRISCUOLO AND GENERAL ACCIDENT INSURANCE COMPANY, INTERVENORS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued October 22, 1991.
Decided June 30, 1992.
*536 Before Judges MICHELS, O'BRIEN and HAVEY.
Stacy L. Moore, Jr. argued the cause for appellant Parker, McCay & Criscuolo, pro se (Stacy L. Moore, Jr. of counsel and on the brief).
Edward R. Murphy argued the cause for appellant General Accident Insurance Company (Murphy and O'Connor, attorneys; Edward R. Murphy, of counsel and on the brief).
Michael D. Schottland argued the cause for respondent Sandra Herman (Schottland, Vernon, Aaron & Costanzo, attorneys; Michael D. Schottland and Vincent P. Manning, of counsel and on the brief).
The opinion of the court was delivered by MICHELS, P.J.A.D.
We granted leave to Parker, McCay & Criscuolo (Parker-McCay) and General Accident Insurance Company (General Accident) to intervene and prosecute appeals as real parties in interest from that portion of a judgment of the Law Division entered on a molded jury verdict awarding plaintiff Sandra Herman compensatory damages with prejudgment interest in the sum of $397,420 and punitive damages in the sum of $400,000 against defendant Sunshine Chemical Specialties, Inc. (Sunshine Chemical) and from a denial of a post-judgment motion by Sunshine Chemical for a new trial in this personal injury product liability tort action.
Briefly, plaintiff instituted this action against defendants Sunshine Chemical and Concord Harley Corp., a/k/a Concord Chemical Company, Inc., a/k/a Harley Chemical Corp., a Division of Concord Chemical Company, Inc. (Harley) to recover damages for personal injuries sustained as a result of exposure to the product Sun-Clean Concentrate distributed by Sunshine *537 Chemical. Plaintiff pursued the action on theories of negligence, strict liability and breach of implied and expressed warranties. She sought to recover compensatory and punitive damages. Plaintiff's husband, plaintiff Robert Herman, sued per quod. Prior to trial, plaintiffs settled their claims with Harley and the matter proceeded to trial solely against Sunshine Chemical. At the conclusion of the proofs, the jury, in answer to special interrogatories, found that Sunshine Chemical's product Sun-Clean Concentrate was defective, that the defect was a proximate cause of the harm to plaintiff, that Sunshine Chemical was negligent and that its negligence was a proximate cause of the harm to plaintiff. The jury also found that Harley knowingly placed in the stream of commerce the defective product Sun-Clean Concentrate and that this was a proximate cause of the harm to plaintiff. The jury then found that, based on comparative fault, Sunshine Chemical was 80% at fault and Harley 20% at fault and that the amount of money to fairly and reasonably compensate plaintiff for the injuries she sustained was $410,000. In addition, the jury awarded plaintiff punitive damages in the amount of $400,000 against Sunshine Chemical. The jury awarded Robert Herman nothing. The trial court thereupon molded the verdict and entered judgment in favor of plaintiff against Sunshine Chemical for $328,000 compensatory damages plus prejudgment interest and $400,000 punitive damages. The trial court denied Sunshine Chemical's motion for a new trial which was based on the grounds that the evidence did not demonstrate willful, wanton or reckless conduct on its part and that plaintiff failed to introduce evidence of its financial worth.
Thereafter, General Accident paid plaintiff the compensatory damage portion of the judgment but refused to pay the punitive damages award. As a result, a partial warrant of satisfaction of the judgment was executed. Sunshine Chemical declined to appeal the punitive damages portion of the judgment and assigned to plaintiff any claim it may have against General Accident and Parker-McCay based on their failure to properly *538 settle or defend the case. According to the Parker-McCay firm, the punitive damages claim was settled when Sunshine Chemical agreed not to prosecute an appeal of the punitive damages awarded thereby locking in the judgment. Because of a potential conflict of interest presented by Sunshine Chemical's refusal to appeal the punitive damages award and Sunshine Chemical's suggestion of future litigation against both General Accident and Parker-McCay, we granted the latter leave to intervene and appeal from the punitive damages portion of the judgment as real parties in interest. We then consolidated both appeals on our own motion.

I.
Preliminarily, contrary to plaintiff's claim, leave to appeal was properly granted in this case. Rule 4:33-2 provides in relevant part:
Upon timely application anyone may be permitted to intervene in an action if his claim or defense and the main action have a question of law or fact in common.... In exercising its discretion the court shall consider whether the intervention will unduly prejudice the adjudication of the rights of the original parties.
Plaintiff, as assignee, has instituted an action against General Accident to recover damages in the sum of $400,000  the amount of the punitive damage award, together with interest and attorney fees. According to plaintiff,
The predicate of that lawsuit is that General Accident and its agent, David Parker, failed to properly protect the individual interests of Sunshine Chemical by settling the case within policy limits for a sum of money which would have secured to them a general release including a release for punitive damages.
As a secondary position it is claimed that General Accident through its agents did not provide a timely notice of the pendency of a punitive damages claim and did not provide a properly executed reservation of rights or permit Sunshine Chemical to obtain independent trial counsel in a meaningful fashion.
Despite plaintiff's assertion that General Accident's failure to put $400,000 in escrow (representing the punitive damages award) negates its standing to appeal, General Accident and Parker-McCay have sufficient interest in the present litigation *539 to warrant their intervention and prosecution of these appeals as the real parties in interest.

II.
We turn now to Parker-McCay's and General Accident's contention that the trial court erred in failing to dismiss the punitive damages claim against Sunshine Chemical because plaintiff failed to present proofs of actual malice or fraudulent or evil motives sufficient to warrant the imposition of punitive damages as a matter of law.
Punitive damages reflect the importation of criminal law principles of punishment into the field of tort law. Prosser & Keeton on Torts § 2, at 9 (5th ed. 1984) (hereinafter "Prosser & Keeton"). Such damages constitute "a sort of hybrid between a display of ethical indignation and the imposition of a criminal fine." Cabakov v. Thatcher, 37 N.J. Super. 249, 259, 117 A.2d 298 (App.Div. 1955) (quoting Haines v. Schultz, 50 N.J.L. 481, 484, 14 A. 488 (Sup.Ct. 1888)). "An award of punitive damages, by its own terms, is punitive in nature...." Belinski v. Goodman, 139 N.J. Super. 351, 359, 354 A.2d 92 (App.Div. 1976). In contrast to compensatory damages, punitive damages serve the "admonitory" function of expressing the "community's disapproval of outrageous conduct...." Fischer v. Johns-Manville Corp., 103 N.J. 643, 657, 512 A.2d 466 (1986). The plaintiff is awarded punitive damages "over and above the full compensation for the injuries, for the purpose of punishing the defendant, of teaching the defendant not to do it again, and of deterring others from following the defendant's example." Prosser & Keeton, supra, § 2, at 9. In accord with these principles, our Supreme Court has stated:
Punitive or exemplary damages are sums awarded apart from compensatory damages and are assessed when the wrongdoer's conduct is especially egregious. They are awarded upon a theory of punishment to the offender for aggravated misconduct and to deter such conduct in the future.
Leimgruber v. Claridge Associates, Ltd., 73 N.J. 450, 454, 375 A.2d 652 (1977); see 49 Prospect Street Tenants Ass'n v. Sheva *540 Gardens, 227 N.J. Super. 449, 479, 547 A.2d 1134 (App.Div. 1988).
However, mere negligence, or even gross negligence, are not a sufficient basis for an award of punitive damages. Enright v. Lubow, 202 N.J. Super. 58, 76, 493 A.2d 1288 (App.Div. 1985), certif. denied, 104 N.J. 376, 517 A.2d 386 (1986); see Berg v. Reaction Motors Div., 37 N.J. 396, 413, 181 A.2d 487 (1962). As noted by Professors Prosser and Keeton:
Something more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or "malice," or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called willful or wanton.
Prosser & Keeton, supra, § 2, at 9-10. See Enright, supra, 202 N.J. Super. at 76, 493 A.2d 1288. Thus, to justify an award of punitive damages, there must be some "positive element of conscious wrongdoing" on defendant's part. Berg, supra, 37 N.J. at 414, 181 A.2d 487. This standard is met "upon a showing that there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences." Id. The focus is not with the underlying tort but with the defendant's conduct and motives therefor. Prosser & Keeton, supra, § 2, at 11.
Here, punitive damages are claimed in the context of a products liability, failure-to-warn action. In products liability actions, punitive damages require some "`outrageous conduct' or conduct which evidences a reckless disregard for public safety." J.D. Lee & Barry A. Lindahl, Modern Tort Law: Liability & Litigation § 27.88, at 811 (rev. ed. 1988) (hereinafter "Modern Tort Law"). Thus, although punitive damages are usually available only for intentional torts, such damages are also available in "cases where, although defendant did not intend to harm the plaintiff, he showed `such a conscious and deliberate disregard of the interests of others that his conduct may be called willful or wanton.'" 2 Louis R. Frumer & Melvin I. Friedman, Products Liability § 8.01 (1990) (citations *541 omitted). In such actions, the Supreme Court has held that punitive damages are available,
when a manufacturer is (1) aware of or culpably indifferent to an unnecessary risk of injury, and (2) refuses to take steps to reduce that danger to an acceptable level. This standard can be met by a showing of "a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences." Berg v. Reaction Motors, supra, 37 N.J. at 414, 181 A.2d 487. [Fischer v. Johns-Manville Corp., supra, 103 N.J. at 670-71, 512 A.2d 466].
Because the focus of products liability law is product safety, our Supreme Court in Fischer v. Johns-Manville Corp., supra, pointed out that a "key factor" in justifying punitive damages "is indifference to or disregard of the dangers posed by the product in its defective state...." 103 N.J. at 672, 512 A.2d 466. The Court in Fischer v. Johns-Manville Corp., supra, set forth guidelines for the trier of fact in a punitive damages case:
In determining whether a defendant's conduct was sufficiently egregious to justify punitive damages, fact-finders should consider the seriousness of the hazard to the public; the degree of the defendant's awareness of the hazard and its excessiveness; the cost of correcting or reducing the risk; the duration of both the improper marketing behavior and its cover-up; the attitude and conduct of the enterprise upon discovery of the misconduct; and the defendant's reasons for failing to act. [103 N.J. at 672-73, 512 A.2d 466].
Thus, it is the indifference to the known potential harm of a product which constitutes the egregious or aggravated conduct justifying an award of punitive damages.
Both Parker-McCay and General Accident contend that Sunshine Chemical's conduct here was not sufficiently egregious to warrant punitive damages. They argue that the failure to indicate that caustics were contained in Sun-Clean Concentrate was not done with knowledge of risks of harm because an "inexperienced" Robert Feldman, the president of Sunshine Chemical, had merely borrowed the contents of the labels of other distributors for Sun-Clean Concentrate's label. They claimed that Feldman's actions amounted to negligence or, at worst, gross negligence and were not sufficiently egregious to warrant punitive damages. We disagree. Our review *542 of the record indicates that the jury had sufficient evidence presented to it to find that Sunshine Chemical was aware of the hazards posed by its products, but failed to put an adequate warning on Sun-Clean Concentrate's label.
The product which injured plaintiff, Sun-Clean Concentrate, is essentially a dyed version of Harley's product 3-D, a heavy-duty industrial cleaner known in the industry as a butyl cleaner. The label on 3-D contained a warning about breathing the product's vapors and using it with proper ventilation, to wit,
Danger. Causes burns. Do not get in eyes, skin or clothing. Avoid breathing vapor. Keep container closed. Use with adequate ventilation. Wash thoroughly after handling. Keep out of reach of children.
Harley prepared Material Data Safety sheets which listed the hazardous components of 3-D, which included the chemical sodium hydroxide. These sheets were sent to Sunshine to inform them of hazardous ingredients in the product. Due to quality-control tests on the product, Sunshine Chemical's chemist, Malcolm Haskel, was aware that Sun-Clean Concentrate contained sodium hydroxide. Sodium hydroxide is a highly alkaline substance and a ph test of a sample of Sun-Clean Concentrate registered a reading of 13 ph on a scale of 14.
The label on Sun-Clean Concentrate bears the statement "contains no ... caustics." This statement is inaccurate because Sun-Clean Concentrate contains sodium hydroxide, which is a high alkaline caustic. Plaintiff's expert opined that Sun-Clean Concentrate's label would not sufficiently warn users of its dangers due to the inaccurate statement that the product does not contain caustics and the failure to contain a warning about breathing the vapor from the product. Feldman created Sun-Clean Concentrate's label by cutting and pasting together the labels of several competitors. Feldman admits that he looked at 3-D's label, but doesn't recall if there was any warning about breathing the product's fumes. Feldman testified that he would submit labels to Robert Solly, former president of Harley, for his approval. However, Solly did not recall checking the Sun-Clean Concentrate label for accuracy.
*543 Contrary to Parker-McCay's and General Accident's claims, Feldman was not as inexperienced as they would portray him. Feldman was the president of Sunshine Chemical since 1974, when he formed the company. Prior to forming Sunshine Chemical, Feldman worked in the chemical industry as president of Selective Chemical Specialties. That company had a product similar to Sun-Clean Concentrate which Feldman believes also contained sodium hydroxide. Moreover, Sunshine Chemical employed a chemist whose duties included examination of product labels to determine technical accuracy. Additionally, Sunshine Chemical marketed another product, Wipe-Out Oven & Grill Cleaner, which also contained sodium hydroxide. The label on this product does contain a warning that it contains sodium hydroxide.
The evidence presented in this case could sustain a judgment in favor of plaintiff. The proofs would support a finding that Sunshine Chemical was aware of the hazards of Sun-Clean Concentrate, but provided inadequate warnings on the label so that its best selling product might appear safer. Such conduct could be found by a reasonable jury to be "a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences." Fischer v. Johns-Manville Corp., supra, 103 N.J. at 671, 512 A.2d 466 (quoting Berg v. Reaction Motors, supra, 37 N.J. at 414, 181 A.2d 487). The jury could find that the defective warning on Sun-Clean Concentrate's label was not due to mistake or inadvertence, and that Sunshine Chemical's conduct in this case warranted punitive damages.

III.
However, we are convinced that the punitive damages judgment must be reversed and the matter remanded for a new trial because of plaintiff's failure to present evidence of Sunshine Chemical's wealth. Whether to award punitive damages and their amount is within the discretion of the trier of fact. *544 Leimgruber, supra, 73 N.J. at 456, 375 A.2d 652; 49 Prospect Street, supra, 227 N.J. Super. at 479, 547 A.2d 1134. See also Prosser & Keeton, supra, § 2, at 14; 22 AM.JUR.2D, Damages § 806, at 853 (1988). However, as the Leimgruber Court recognized, a jury faces a "major difficulty" in setting the amount of a punitive damages award due to the lack of "any definitive standard or criterion to guide the trier of fact in determining the proper amount." 73 N.J. at 456-57, 375 A.2d 652. This uncertainty raises concerns expressed by the United States Supreme Court in Pacific Mutual Ins. Co. v. Haslip, ___ U.S. ___, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). There the United States Supreme Court found that the common law method of assessing punitive damages did not constitute a per se denial of due process. ___ U.S. at ___, 111 S.Ct. at 1042-43, 113 L.Ed.2d at 19. However, the Supreme Court also expressed "concern about punitive damages that `run wild'." Id. ___ U.S. at ___, 111 S.Ct. at 1043-44, 113 L.Ed.2d at 20. As the Supreme Court noted:
One must concede that unlimited jury discretion  or unlimited judicial discretion for that matter  in the fixing of punitive damages may invite extreme results that jar one's constitutional sensibilities. [Id.]
It is with respect for such concerns that the requirements of a punitive damages award must be examined.
Clearly, the wealth or financial condition of the defendant is a relevant consideration in guiding the assessment of punitive damages. See Belinski v. Goodman, supra, 139 N.J. Super. at 357-58, 354 A.2d 92. Prosser and Keeton note that "[m]ost courts agree that evidence of the defendant's wealth may be received as bearing on the question of the amount which will adequately punish the defendant for the conduct." Prosser & Keeton, supra, § 2, at 15. The trier of fact considers defendant's wealth because the "degree of punishment or deterrence is to some extent proportionate to the means of the wrongdoer." 22 AM.JUR.2D, Damages § 807. See also Restatement (Second) of Torts § 908(2), comment e (1977). Thus, in assessing punitive damages "evidence of financial *545 situation of the defendant is important for the jury so that it may determine the sum of damages which will be adequate enough to punish the defendant and to work as a deterrent to similar conduct in the future." Modern Tort Law, supra, § 21.37, at 807.
In a recent ruling, the California Supreme Court recognized that the purpose of punitive damages is punishment and deterrence, not the financial destruction of the defendant. Adams v. Murakami, 284 Cal. Rptr. 318, 322, 54 Cal.3d 105, 813 P.2d 1348, 1352 (1991). Without evidence of a defendant's wealth a reviewing court is unable to ascertain the effect that the amount of punitive damages will have on the defendant. In this regard, the Adams court pointed out the ancient roots behind examining the defendant's wealth:
The principle that a punitive award must be considered in light of the defendant's financial condition is ancient. After the Norman conquest in 1066, there arose in English law a system of civil sanctions known as "amercements." (Browning-Ferris Industries v. Kelco Disposal (1989) 492 U.S. 257, 287-289, 109 S.Ct. 2909, 2927, 106 L.Ed.2d 219, 246 [conc. and dis. opn. of O'Connor, J.].) Because of the sometimes abusive nature of amercements, the Magna Carta prohibited those that were disproportionate to the offense or that would deprive the wrongdoer of his means of livelihood: "A freeman shall only be amerced for a small offence according to the measure of that offence. And for a great offence he shall be amerced according to the magnitude of the offence, saving his contentment; and a merchant, in the same way, saving his merchandize. And a villein, in the same way, if he fall under our mercy, shall be amerced saving his wainnage." (Magna Carta (1215) ch. 20, italics added.) Absent evidence of a defendant's financial condition, a punitive damages award can financially annihilate him. We see no reason why a modern-day civil defendant should be entitled to less consideration than one was given 800 years ago. [813 P.2d at 1352-53 (footnote omitted)].
In Leimgruber, supra, our own Supreme Court emphasized that the defendant's wealth is a factor to be considered in setting punitive damages:

In assessing such damages, the trier of fact should take into consideration all of the circumstances surrounding the particular occurrence including the nature of the wrongdoing, the extent of the harm inflicted, the intent of the party committing the act, the wealth of the perpetrator, as well as any mitigating circumstances which may operate to reduce the amount of damages. [73 N.J. at 456, 375 A.2d 652 (emphasis added)].
*546 See 49 Prospect Street, supra, 227 N.J. Super. at 479, 547 A.2d 1134; see also Restatement (Second) of Torts § 908(2).
In McDonough v. Jorda, 214 N.J. Super. 338, 348-49, 519 A.2d 874 (App.Div. 1986), certif. denied, 110 N.J. 302, 540 A.2d 1282 (1988), cert. denied, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989), we held that the wealth of the defendant must be considered in the assessment of punitive damages:
The $225,000 punitive damage award must be set aside for failure of proof on the issue of the wealth of plaintiff and Grey. In assessing exemplary damages, a jury must take into consideration the wealth of the defendants. Leimgruber v. Claridge Associates, 73 N.J. at 456, 375 A.2d 652. This is so because the theory behind punitive damages is to punish for the past event and to prevent future offenses, and the degree of punishment resulting from a judgment must be, to some extent, in proportion to the means of the guilty person. Restatement (Second) of Torts § 908 comment d (1977).
Jorda offered no evidence on the ability of the wrongdoers to pay any award. That lack of evidence, an essential of Jorda's burden of proof, precluded the jury from having a proper foundation to assess damages. Moreover, in the absence of a ruling or instruction by the court, the jury had no idea of the appropriate law.
See Battista v. Western World Co., 227 N.J. Super. 135, 150, 545 A.2d 841 (Law Div. 1988), affirmed in part and reversed in part, Battista v. Olson, 250 N.J. Super. 330, 335-36, 594 A.2d 260 (App.Div.), certif. denied, 127 N.J. 553, 606 A.2d 366 (1991) (based on McDonough, one million dollar settlement of punitive damages claim set aside since it bore no relationship to the offending party's assets).
Plaintiff asserts that a defendant's wealth is merely a factor which may be considered by the jury, but it is not determinative. This argument plainly runs counter to our holding in McDonough. Moreover, in Leimgruber, the Supreme Court recognized the importance of considering a defendant's wealth in its rejection of a "ratio rule" under which punitive damages would be required to be in some fixed proportion to compensatory damages. 73 N.J. at 457, 375 A.2d 652. One of the reasons for rejecting the "ratio rule" was that such a rule does not discuss "other considerations which normally enter into a punitive damage assessment ... such as the comparative seriousness *547 of the misconduct and the wealth of the malefactor." Id. at 459, 375 A.2d 652. In Comdyne I., Inc. v. Corbin, 908 F.2d 1142, 1153 n. 4 (3d Cir.1990), the Third Circuit Court of Appeals cited Leimgruber as support for the proposition that the trial court must consider a defendant's wealth in assessing punitive damages.
In addition, the recent California Supreme Court decision in Adams, supra, supports the holding in McDonough. The Adams court held that evidence of a defendant's financial condition is a prerequisite to a punitive damages award and that plaintiff has the burden of introducing such evidence. 813 P.2d at 1351. In light of the purposes of punitive damages, punishment and deterrence, an award of such damages must be reviewed by an appellate court to determine if it "exceeds the level necessary to properly punish and deter." Id. at 1350 (citations omitted). This analysis cannot be accomplished without relevant factual data regarding the defendant's wealth. "Deciding in the abstract whether an award is `excessive' is like deciding whether it is `bigger' without asking `Bigger than what?'" Id. at 1350-51. Thus, without evidence of defendant's wealth or financial condition, the reviewing court can only speculate as to whether the punitive damages award appropriately serves the goals of punishment and deterrence. Id. at 1352.
Likewise, without evidence of a defendant's wealth, the jury would be forced to guess what amount of damages will properly punish or deter the defendant. The Adams court pointed out that the United States Supreme Court's decision in Haslip, although not making evidence of defendant's wealth a constitutional requirement, requires judicial scrutiny of punitive damages awards which "weighs heavily in favor of evidence of a defendant's financial condition." Id. at 1356.
Finally, we are convinced that the California Court's reasoning is persuasive and totally in accord with our holding in McDonough. Clearly, evidence of the defendant's wealth must *548 be introduced to justify a punitive damages award. Our Legislature has also recognized this in the enactment of the Products Liability Act of 1987, N.J.S.A. 2A:58C-1 et. seq., which requires the trier of fact to consider, inter alia, "[t]he financial condition of the tortfeasor." N.J.S.A. 2A:58C-5d(4).
Plaintiff also argues that sufficient evidence of Sunshine Chemical's wealth was introduced at trial. Specifically, plaintiff points to Feldman's testimony that Sunshine Chemical had gross sales of about three million dollars in 1985 and gross sales of about three and a half million dollars in 1986. Feldman also testified that he had sold his stock in Sunshine Chemical to Share Corporation for $750,000. Additionally, Feldman indicated that sales of Sun-Clean Concentrate constituted approximately one-third of Sunshine Chemical's total sales and that Sun-Clean Concentrate was Sunshine Chemical's best selling product. A thorough review of the record reveals that the above is the only evidence introduced regarding Sunshine Chemical's wealth. The question remains whether this evidence is sufficient indicia of Sunshine Chemical's financial condition or wealth to support an award of punitive damages. In our view it is not.
We hold, therefore, that there was insufficient evidence introduced at trial for the jury to accurately assess punitive damages. Gross sales coupled with the fact that sales of Sun-Clean Concentrate constituted one-third of Sunshine Chemical's total sales may be some indication of the economic benefit derived from selling Sun-Clean Concentrate. However, without an analysis of Sunshine Chemical's overall financial condition, specifically its net worth, this information does not convey whether the amount of punitive damages awarded properly serves the goals of punishment and deterrence.
Accordingly, the punitive damages judgment under review is reversed and the matter remanded to the trial court for a new trial solely on the issue of punitive damages.