627 A.2d 1081

SANDRA HERMAN, PLAINTIFF–APPELLANT, AND ROBERT HERMAN, HER HUSBAND, PLAINTIFF, v. SUNSHINE CHEMICAL SPECIALTIES, INC., A N.J. CORP.; CONCORD HARLEY CORP., D/B IN N.J., A/K/A CONCORD CHEMICAL CORP., A/K/A HARLEY CHEMICAL CORP., A/K/A CONCORD CHEMICAL COMPANY, INC., A/K/A HARLEY CHEMICAL CORP., A DIVISION OF CONCORD CHEMICAL COMPANY, INC., DEFENDANTS.

PARKER, MCCAY & CRISCUOLO AND GENERAL ACCIDENT INSURANCE COMPANY, INTERVENORS–RESPONDENTS.

Argued February 16, 1993—Decided July 28, 1993.

330

*Michael D. Schottland* argued the cause for appellant (*Schottland, Vernon, Aaron, Plaza & Costanzo*, attorneys; *Vincent P. Manning*, on the brief).

*Stacy L. Moore, Jr.,* argued the cause for respondent Parker, McCay & Criscuolo (*Parker, McCay & Criscuolo,* attorneys).

*Ernest L. Alvino, Jr.,* argued the cause for respondent General Accident Insurance Company (*Murphy and O'Connor,* attorneys).

The opinion of the Court was delivered by

POLLOCK, J.

This case raises the issue whether plaintiffs in a products-liability action presented sufficient evidence of the financial condition of defendant Sunshine Chemical Specialties, Inc. (Sunshine) to sustain an award of punitive damages. Finding the evidence insufficient, the Appellate Division reversed the judgment and remanded the matter to the Law Division. 257 *N.J.Super.* 533, 608 *A.*2d 978 (1992). We granted the petition for certification of plaintiff Sandra Herman (plaintiff or Mrs. Herman), 130 *N.J.* 398, 614 *A.*2d 620 (1992), reverse the judgment of the Appellate Division, and reinstate the $400,000 award of punitive damages.

–I–

In February 1985, Sunshine engaged Sandra Herman as an independent contractor to demonstrate and sell its products. During a two-day training period, Sunshine instructed Mrs. Herman about the company's products and personnel. No part of the training concerned the potential hazards or safe use of the products.

Sunshine's best-selling product was Sun–Clean Concentrate (Sun–Clean), an all-purpose cleaner that generated gross sales of $1 million in 1985 and $1.2 million in 1986. The Sun–Clean label stated: "SUN CLEAN is safe to use." In larger print, the label provided that Sun–Clean "CONTAINS NO ACIDS, CAUSTICS[,] AMMONIA, ALIPHATIC OR AROMATIC SOLVENTS." The label represented that Sun–Clean met the "operating standards" of the Occupational Safety and Health Administration (OSHA). It did not warn of the dangers of inhaling Sun–Clean vapors.

Sunshine did not manufacture Sun–Clean. Instead, it purchased in bulk from Harley Chemical Corp. (Harley) a product called "3–D," which Harley colored orange and transferred to one- and five-gallon containers bearing the Sun–Clean label.

Robert Feldman, the president and sole owner of Sunshine, designed the Sun–Clean label by cutting and pasting together the labels from products of other manufacturers. Although Harley had provided to Sunshine a "safety data sheet" that outlined the hazardous ingredients of its products, Feldman either did not know of the sheet or ignored it. The sheet indicated that 3–D contained sodium hydroxide, a caustic soda. In contrast, the Sun–Clean label specifically stated that the product contained no caustics. Harley placed on 3–D a label warning, "Danger.... Avoid breathing vapor. Keep container closed. Use with adequate ventilation." The Sun–Clean label, however, did not warn against breathing Sun–Clean vapors. Furthermore, Sunshine did not submit either the label or the product to OSHA for approval, nor did the company consult "OSHA operating standards" to determine whether the product met those standards. Feldman simply had removed the OSHA seal from another label.

Feldman submitted the cut-and-paste label to Robert Solly, the president of Harley. Solly reviewed the label for accuracy. A chemist employed by Sunshine also had the responsibility to review labels. Neither Solly nor the chemist recommended any changes.

While demonstrating Sun–Clean in July 1985, Mrs. Herman suffered a coughing fit. Shortly thereafter she developed a fever and breathing problems. After two weeks she consulted a doctor, who treated her for a suspected respiratory infection. Her respiratory problems continued, and she consulted a second physician and then an allergist, who were likewise unsuccessful in treating her. The doctors then placed her on steroid- and cortisone-based drugs that improved her breathing, but caused her to gain over sixty pounds.

Mrs. Herman continued to work for Sunshine after she became ill. Not until October 1986 did her doctors suspect a connection between her asthma and her work. Mrs. Herman stopped working for Sunshine the next month. In August 1987 her doctors learned that Sun–Clean contained a caustic, sodium hydroxide. The doctors then diagnosed her as suffering from "occupational asthma," meaning asthma not related to allergies but caused by exposure to chemicals in the workplace.

On September 3, 1987, Mrs. Herman and her husband filed a complaint against Sunshine Chemical and Concord Chemical Corp. (Concord), which had purchased Harley. They asserted claims in strict liability, negligence, and breach of express and implied warranty. Later, they amended the complaint to include a claim for punitive damages.

■ Plaintiffs settled with Concord, and the trial proceeded against Sunshine. At trial, all counsel mistakenly assumed that *N.J.S.A.* 2A:58C–1 to –7 (the act), concerning product liability and punitive damages, did not apply to the case. Apparently they thought that the act did not apply because the alleged wrongful conduct had occurred before the act's passage. The act, however, provides: "This act shall take effect immediately except that provisions of this act that establish new rules with respect to the burden of proof or the imposition of liability in product liability actions shall apply only to product liability actions filed on or after the date of enactment." *L.*1987, *c.* 197, § 8 (codified as Historical Note to *N.J.S.A.* 2A:58C–1). Section 8 clearly states that the act applies to all products-liability actions filed after the date of enactment, July 22, 1987. This action was filed on September 3 of that year. The act applies.

In a supplemental brief submitted after oral argument, plaintiff asserts that the parties implicitly agreed that the common law, not the act, should govern this case. Defendants disagree. We cannot resolve the issue on the record, which contains no evidence of any such agreement.

In response to specific questions, the jury returned a verdict finding that Sun–Clean was defective, that the product had harmed Mrs. Herman, that Sunshine had been negligent, and that its negligence had harmed her. The jury also found that Concord had knowingly placed in the stream of commerce the defective product, which also had harmed Mrs. Herman. Apportioning fault eighty percent to Sunshine and twenty percent to Concord, the jury awarded Mrs. Herman $410,000 in compensatory damages and $400,000 in punitive damages. It awarded nothing to Mr. Herman, who, by the time of trial, had separated from Mrs. Herman and was seeking a divorce.

Sunshine unsuccessfully moved for a new trial, arguing in part that Mrs. Herman had not presented sufficient evidence of defendants' financial condition and that the punitive damages were excessive.

General Accident Insurance Company (General Accident), which insured Sunshine, paid to Mrs. Herman the compensatory damages and received a partial warrant for satisfaction. It refused, however, to pay the punitive damages.

Sunshine settled the punitive-damages award by paying plaintiff an undisclosed sum of money and by assigning to her any claim it might have for bad-faith failure-to-settle against General Accident or for legal malpractice against the law firm of Parker, McCay & Criscuolo (Parker), which had represented Sunshine at trial. In exchange, Mrs. Herman agreed not to seek further payment from Sunshine for punitive damages. She also agreed to reimburse Sunshine to the extent of $100,000 if she recovered from either General Accident or Parker. Over Mrs. Herman's objections, the Appellate Division permitted Parker and General Accident to prosecute an appeal of the punitive-damages award against Sunshine. Without further objection from Mrs. Herman, Parker and General Accident appear as respondents in this Court.

Before the Appellate Division, Parker and General Accident argued that plaintiff had not presented sufficient evidence of actual malice or fraudulent or evil motives to justify an award of

punitive damages. They also argued that the evidence of Sunshine's financial condition was insufficient to permit the jury to determine the amount of punitive damages. They did not, however, argue that the damages were excessive. Nor did they challenge the constitutionality of the punitive-damages award or the procedure for appellate review of such an award. The net result is that Sunshine has settled the punitive-damages award with Mrs. Herman, and the excessiveness of that award is not before us.

The Appellate Division found the evidence sufficient to support the jury's findings that Sunshine had been indifferent to, or had disregarded, the known dangers posed by Sun–Clean. 257 *N.J.Super.* at 541–42, 608 *A.*2d 978. It, however, reversed the punitive-damages judgment, finding that plaintiff had failed to present sufficient evidence of Sunshine's wealth. *Id.* at 543–48, 608 *A.*2d 978. Consequently, it remanded the case to the Law Division for a trial on punitive damages only.

–II–

In recent years courts, legislatures, and scholars have resumed the long-standing debate on the legitimacy of punitive-damage awards. The polemic has ranged from calls for the abolition of punitive damages to arguments for controlling them through more definite standards. Both this Court and the Legislature, although recognizing that a punitive-damages award may be appropriate in some products-liability actions, have tried to set standards to assure that any such award is fair and reasonable.

We have proceeded with an appreciation that at the core of punitive damages lurks a volatile dilemma: the same findings necessary for the award of punitive damages can incite a jury to act irrationally. A condition precedent to a punitive-damages award is the finding that the defendant is guilty of actual malice. The purposes of the award—the deterrence of egregious misconduct and the punishment of the offender, *Leimgruber v. Claridge Assocs., Ltd.*, 73 *N.J.* 450, 454, 375 *A.*2d 652 (1977)—when mixed with a finding that the defendant is malicious, can readily inflame

an otherwise-dispassionate jury. Essential to a fair and reasonable award therefore is the consideration of all relevant circumstances, including the nature of the defendant's misconduct and the harm to the plaintiff. *Id.* at 456, 375 *A.*2d 652. Stated generally, the award of punitive damages "must bear some reasonable relation to the injury inflicted and the cause of the injury." *Id.* at 457, 375 *A.*2d 652.

■ At a minimum, due process requires appellate review of the award for reasonableness. *TXO Prod. Corp. v. Alliance Resources Corp.,* —— *U.S.* ——, ——, 113 *S.Ct.* 2711, 2720, 125 *L.Ed.*2d 366 (1993); *Pacific Mut. Life Ins. Co. v. Haslip,* 499 *U.S.* 1, 18, 111 *S.Ct.* 1032, 1043, 113 *L.Ed.*2d 1, 20 (1991). Without statutory or common-law standards for determining the amount of punitive damages, moreover, " 'juries are left largely to themselves in making this important, and potentially devastating, decision.' " *Haslip, supra,* 499 *U.S.* at ——, 111 *S.Ct.* at 1039, 113 *L.Ed.*2d at 15 (quoting *Browning–Ferris Indus. v. Kelco Disposal, Inc.,* 492 *U.S.* 257, 281, 109 *S.Ct.* 2909, 2923, 106 *L.Ed.*2d 219, 242 (1989) (Brennan, J., concurring)). In the absence of adequate standards, "[a]wards of punitive damages are skyrocketing." *Browning–Ferris Indus. v. Kelco Disposal, Inc.,* 492 *U.S.* 257, 282, 109 *S.Ct.* 2909, 2924, 106 *L.Ed.*2d 219, 242 (1989) (O'Connor, J., concurring in part and dissenting in part).

■■ As long as punitive-damage awards are strictly confined, they may be appropriate in a failure-to-warn, strict-products-liability action. *Fischer v. Johns–Manville Corp.,* 103 *N.J.* 643, 652–60, 512 *A.*2d 466 (1986). *Fischer* identified the factors relevant to the determination of a plaintiff's entitlement to punitive damages, *id.* at 672–73, 512 *A.*2d 466, and of the appropriate amount of such damages, *id.* at 673, 512 *A.*2d 466. In addition to bearing a reasonable relationship to actual injury, the amount of punitive damages should account for the profitability of the defendant's marketing misconduct, the plaintiff's litigation expenses, the punishment the defendant will probably receive from other

sources, the defendant's financial condition, and the effect on its condition of a judgment for the plaintiff. *Ibid.*

■ Our case law recognizes the defendant's financial condition as a relevant factor in all punitive-damages awards. The Appellate Division has stated in *McDonough v. Jorda* that "[i]n assessing exemplary damages, a jury must take into consideration the wealth of the defendants." 214 *N.J.Super.* 338, 349, 519 *A.2d* 874 (1986), *certif. denied,* 110 *N.J.* 302, 540 *A.2d* 1282 (1988), *cert. denied,* 489 *U.S.* 1065, 109 *S.Ct.* 1338, 103 *L.Ed.2d* 809 (1989); *see also Battista v. Western World Ins. Co.,* 227 *N.J.Super.* 135, 150–51, 545 *A.2d* 841 (Law Div.1988) (affirming trial court's setting aside settlement based on jury award of $1 million in punitives against police officer because award bore no relation to officer's yearly salary and total assets), *aff'd in part and rev'd in part sub nom. Battista v. Olson,* 250 *N.J.Super.* 330, 594 *A.2d* 260 (App. Div.), *certif. denied,* 127 *N.J.* 553, 606 *A.2d* 366 (1991); *Comdyne I, Inc. v. Corbin,* 908 *F.2d* 1142, 1153 n. 14 (3d Cir.1990) (interpreting *Leimgruber, supra,* 73 *N.J.* 450, 375 *A.2d* 652, as holding that trier of fact must consider wealth of defendant when awarding punitive damages). In *McDonough,* the court stated that a defendant's financial condition must be considered "because the theory behind punitive damages is to punish for the past event and to prevent future offenses, and the degree of punishment resulting from a judgment must be, to some extent, in proportion to the means of the guilty person." 214 *N.J.Super.* at 349, 519 *A.2d* 874 (citing *Restatement (Second) of Torts* § 708 cmt. e (1977)). The *McDonough* court concluded that evidence of the ability of the wrongdoers to pay punitives is an "essential" of the plaintiff's burden of proof, the absence of which "precluded the jury from having a proper foundation to assess damages." 214 *N.J.Super.* at 349, 519 *A.2d* 874.

■ When adopting *N.J.S.A.* 2A:58C–1 to –7, the Legislature substantially codified the judicial standards for the award of punitive damages. *Assembly Insurance Committee, Statement to S. 2805* (June 22, 1987); *see also* William A. Dreier et al., *Product Liability and Toxic Tort Law in New Jersey: A Practitioner's*

*Guide* 129 (6th ed. Supp.1993) (stating that "the standards of the Act substantially codify *Fischer v. Johns–Manville Corp.,* 103 *N.J.* 643, 512 *A.*2d 466 (1986)"). The act mandates that in determining the amount of punitive damages in product-liability actions, the trier of fact "shall consider all relevant evidence, including, but not limited to . . . [t]he financial condition of the tortfeasor." *N.J.S.A.* 2A:58C–5d(4); *see A.* 2068, 205th Leg., 1st Sess., § 1b(4) (1992) (mandating consideration of financial condition of defendant in all actions based on injuries or wrongs done to either persons or property); *see also A.* 2206, 205th Leg., 2d Sess. (1993) (establishing procedure for determining punitives ·in all civil actions).

Some scholars, however, have challenged the relevance of a defendant's wealth in determining the amount of punitive damages, especially when the defendant is a corporation. See, *e.g.,* Bruce Chapman & Michael Trebilcock, *Punitive Damages: Divergence in Search of a Rationale,* 40 *Ala. L.Rev.* 741, 824 (1989) (stating that "in the case of economic wrongs, the conventional economic theory of deterrence . . . suggests no role for corporate wealth in structuring an optimal deterrence regime—if the expected costs of wrongdoing exceed the expected gains, wrongdoing will normally be deterred, whatever the corporation's wealth"); Malcolm E. Wheeler, *A Proposal for Further Common Law Development of the Use of Punitive Damages in Modern Product Liability Litigation,* 40 *Ala.L.Rev.* 919, 940, 944–45 (1989) (rejecting as irrelevant and prejudicial consideration of defendant's wealth in determining amount of punitives to award); *see also Zazu Designs v. L'Oreal, S.A.,* 979 *F.*2d 499, 508 (7th Cir.1992) ("Corporations . . . are not wealthy in the sense that persons are. . . . Seeing the corporation as wealthy is an illusion, which like other mirages frequently leads people astray."). *But see Adams v. Murakami,* 54 *Cal.*3d 105, 284 *Cal.Rptr.* 318, 326 n. 8, 813 *P.*2d 1348, 1356 n. 8 (1991) (mandating consideration of defendant's financial condition); *Nelson v. Jacobsen,* 669 *P.*2d 1207, 1219 (Utah 1983) (same); *Adel v. Parkhurst,* 681 *P.*2d 886, 892 (Wyo.1984) (same). Other scholars have suggested that consideration of wealth may be unconstitutional. See Kenneth S. Abraham & John C. Jeffries, Jr.,

*Punitive Damages and the Rule of Law: The Role of Defendant's Wealth*, 18 *J.Legal Stud.* 415, 416, 424–25 (1989) (arguing that admitting evidence of defendant's wealth is "unwise" because "[t]he practice fails to achieve any legitimate purpose," such as deterrence, and because "[a]dmitting evidence of the defendant's wealth invites conjecture [concerning past misconduct], as well as judgments based on mere status"). *But see Haslip, supra,* 499 U.S. at ——, 111 *S.Ct.* at 1045, 113 *L.Ed.*2d at 22 (finding constitutional Alabama's procedure for reviewing punitive-damage awards, which mandates consideration of defendant's financial position); *Germanio v. Goodyear Tire & Rubber Co.,* 732 *F.Supp.* 1297 (D.N.J.1990) (finding disclosure to jury of defendant's financial condition does not violate equal protection).

Still other courts and scholars argue in favor of considering the defendant's financial condition. As the author of one law review article states, "the underlying rationale of punitive damages seems to demand consideration of a defendant's wealth, since a sum that would deter a poor person may have little or no impact on a rich person." Jerry J. Phillips, *A Comment on Proposals for Determining Amounts of Punitive Awards,* 40 *Ala.L.Rev.* 1117, 1119 (1989). Consideration of a defendant's wealth is relevant both to preventing the imposition of an especially devastating fine, *see Adams, supra,* 284 *Cal.Rptr.* at 323, 813 *P.*2d at 1353 ("Absent evidence of a defendant's financial condition, a punitive damages award can financially annihilate him."), and to determining the amount that will sufficiently punish and deter, *see* David G. Owen, *Punitive Damages in Products Liability Litigation,* 74 *Mich. L.Rev.* 1257, 1318 & n. 295 (1976) (stating that principle that amount of punitives awarded should be tailored to defendant's wealth "is rooted in logic and justice and is accepted by most courts").

In a products-liability action, the Legislature has resolved the issue by determining that the trier of fact "shall consider ... [t]he financial condition of the tortfeasor." *N.J.S.A.* 2A:58C–5d(4). That mandate comports with prior judicial decisions. We conclude

that a jury must consider evidence of a defendant's financial condition in determining the amount of punitive damages.

## –III–

Although the Appellate Division concluded ·that the evidence supported a finding that plaintiff was entitled to an award of punitive damages, it "reversed and ... remanded for a new trial because of plaintiff's failure to present evidence of Sunshine Chemical's wealth." 257 *N.J.Super.* at 543, 608 *A.*2d 978. General Accident and Parker did not cross-petition from the determination that Sunshine's conduct warranted a punitive-damage award. Nor did they argue in either the Appellate Division or in the briefs submitted to this Court that the award of $400,000 was excessive. The only issue therefore is whether the evidence can support an award of punitive damages. Contrary to the Appellate Division, we find that the evidence was sufficient. The informality that pervaded the trial, however, leaves some loose ends.

Until the jury returned the $400,000 award, the parties assumed a relaxed attitude toward the punitive-damages claim. Plaintiff made no attempt to make discovery or offer evidence of Sunshine's financial condition on her case-in-chief. At the close of plaintiff's case, Sunshine did not move to dismiss because of the absence of any such evidence. The relevant facts on Sunshine's financial condition emerged on plaintiff's cross-examination of Feldman.

For whatever reason, the trial did not conform to the act. The act mandates a bifurcated proceeding in which

> [t]he trier of fact shall first determine whether compensatory damages are to be awarded. Evidence relevant only to punitive damages shall not be admissible in that proceeding. After such determination has been made, the trier of fact shall, in a separate proceeding, determine whether punitive damages are to be awarded.

### [*N.J.S.A.* 2A:58C–5b.]

The act provides further that "[i]f the trier of fact determines that punitive damages should be awarded, the trier of fact shall then determine the amount of those damages." *N.J.S.A.* 2A:58C–5d.

Although section 5d could be read to require a further bifurcation of the punitive-damages hearing, neither the words nor the legislative history of the statute compels that result. Unlike its treatment of the trial of compensatory and punitive damages, the Legislature did not require the bifurcation of the liability and damage phases of a punitive-damages claim. See *Model Jury Charges* 5.34J and 6.20 (proposing single charge on liability and damages in punitive-damages claim); Dreier et al., *supra,* at 130–31 (stating that section 5d requires only separate determinations, not separate proceedings, for determining entitlement and damages).

 Although the act does not expressly allocate the burden of proof, it states that "[e]xcept as otherwise expressly provided in this act, no provision of this act is intended to establish any rule, or alter any existing rule, with respect to the burden of proof in a product liability action." *N.J.S.A.* 2A:58C–7. Just one year before the adoption of the act, the Appellate Division made clear that the burden of proof rests on the plaintiff. *McDonough, supra,* 214 *N.J.Super.* at 346, 519 *A.2d* 874. Consequently, the act does not change that allocation.

In sum, plaintiff sought no discovery of Sunshine's financial condition. Nor did she introduce any evidence of its financial condition at trial. Sunshine, however, did not move at the close of plaintiff's case to dismiss the punitive-damage claim because of the failure to adduce evidence of defendant's financial condition. Evidence of Sunshine's financial condition emerged on the cross-examination of the company's president. Although the jury ultimately heard the necessary proof, the procedure did not comport with the statutory requirements. To avoid similar problems in the future, we provide the following guidelines for the trial of punitive-damage claims. The guidelines are not definitive, and we anticipate that further guidance will evolve in future cases.

 Tempering the normal rule favoring wide discovery of relevant issues is a regard for the defendant's interest in maintaining the confidentiality of information about its financial status. We have not previously considered the issue, but in a variety of

contexts lower courts have prudently required that a plaintiff may not make discovery of a defendant's financial condition without first establishing a *prima facie* case of the right to recover punitive damages. Those courts have required the plaintiffs to establish their right to punitive damages in actions for libel, *Hudak v. Fox,* 215 *N.J.Super.* 233, 235–37, 521 *A.*2d 889 (App.Div. 1987); *Warren v. Hague,* 11 *N.J.Super.* 311, 316, 78 *A.*2d 300 (App.Div.1951); *Stern v. Abramson,* 150 *N.J.Super.* 571, 575, 376 *A.*2d 221 (Law Div.1977); malicious prosecution, *Gierman v. Toman,* 77 *N.J.Super.* 18, 22–23, 185 *A.*2d 241 (Law Div.1962); and for tortious interference with prospective economic advantage, *Belinski v. Goodman,* 139 *N.J.Super.* 351, 357–58, 354 *A.*2d 92 (App.Div.1976). Judicial review of applications for discovery, like the bifurcation of compensatory and punitive-damage claims, should alleviate concerns about abusive or burdensome discovery. *Gierman, supra,* 77 *N.J.Super.* at 22–23, 185 *A.*2d 241; see *R.* 4:10–3 (providing for protective discovery orders). In reviewing requests for discovery of a defendant's financial condition, a trial court should balance the plaintiff's need for the information with the burden on a defendant of disclosure, *Gierman, supra,* 77 *N.J.Super.* at 25, 185 *A.*2d 241, and with an appreciation that a defendant's finances "are private matters which are normally jealously guarded," *Rupert v. Sellers,* 48 *A.D.*2d 265, 368 *N.Y.S.*2d 904 (1975).

 Sensitive balancing by the trial court is essential to the accommodation of a plaintiff's need for discovery and the defendant's right to maintain the confidentiality of information about its financial condition. *See* Martin J. McMahon, Annotation, *Discovery of Defendant's Sales, Earnings, or Profits on Issue of Punitive Damages in Tort Action,* 54 *A.L.R.*4th 998 (1987) (collecting cases). In many cases, a plaintiff can obtain the needed information through the production of documents. For publicly-held corporate defendants, discovery of annual shareholder reports or reports filed with regulatory bodies should not unreasonably invade the defendant's privacy. Certified financial statements of a privately-held corporation may also be discoverable in an appro-

priate case. Discovery of income tax returns, however, may go too far. *Lepis v. Lepis,* 83 *N.J.* 139, 158, 416 *A.*2d 45 (1980) (stating in matrimonial action "[c]ourts have recognized that discovery and inspection of income tax returns should only be permitted for good cause."). *See generally* Richard J. Kohlman, *Trial Court Restrictions on Evidence of Defendant's Wealth,* 30 *Am.Jur.Trials* 711, 729–30 (1983) (discussing restrictions on disclosure of tax returns). Under some circumstances, depositions or interrogatories may be appropriate. *See R.* 4:15; *R.* 4:17. If so, a trial court can accord a defendant some measure of protection by limiting the persons present at the deposition to the defendant and counsel for the parties. See *R.* 4:10–3; *R.* 4:17–6. Excluding the plaintiff and sealing the deposition or answers to interrogatories may be essential for striking the right balance of the litigants' interests. See *R.* 4:10–3; *R.* 4:17–6. We offer the foregoing possibilities merely as suggestions for the suitable resolution of a sensitive issue that we remit to the sound discretion of trial courts.

■ Neither the product-liability act nor judicial decisions define "financial condition." From the purposes of punitive damages—punishment and deterrence—we glean that "financial condition" roughly means the ability to pay. Contrary to the Appellate Division, 257 *N.J.Super.* at 548, 608 *A.*2d 978, that ability does not necessarily equate with net worth. Depending on the facts of a case, a defendant's income might be a better indicator of the ability to pay. Robert W. Hamilton, *Fundamentals of Modern Business* § 11.5 to .8 (1989); *see also* 1 James D. Ghiardi & John J. Kircher, *Punitive Damages: Law and Practice* § 5.36, at 50 (1985) ("Net income is the best yardstick for determining punitive damages."); Erich A. Helfert, *Techniques of Financial Analysis* 362–68 (7th ed. 1991) (discussing various definitions of "value"). For present purposes, we need not dwell on the subtleties of "net worth," except to note that it can be an elusive concept, Hamilton, *supra,* § 11.4, at 232; a potentially-puzzling indicator of current value, *id.* § 11.7, at 241; and of questionable utility, Helfert, *supra,* at 365. Notwithstanding these problems, net worth remains one of the indicia of financial condition.

Although the present case arises in the context of a claim for punitive damages in a products-liability action, the requirements for bifurcation of compensatory and punitive damages, for allocation to a plaintiff of the burden of proving a defendant's financial condition, for proof of a *prima facie* case as a condition precedent to discovery of a defendant's financial condition, and for limitations on such discovery apply as readily to all such claims. Consequently, we expect those requirements to govern all claims for punitive damages, even those that arise outside the act.

▮ In this case, the cross-examination of Sunshine's president revealed that Sun–Clean was Sunshine's best-selling product, accounting for approximately one-third of the company's gross sales of $3 million. Feldman also testified that in 1986, when Sunshine's gross sales had grown to $3.5 million, he and his wife sold 100% of Sunshine's stock for $750,000. That evidence, although not overwhelming, is sufficient to support an award of punitive damages. Although the jury did not know of the net profit from the sale of Sun–Clean, it knew the gross sales figures for both the product and the company. It also knew that one year after Mrs. Herman's injury Feldman had sold 100% of the stock of the corporation for $750,000. "A sale of the entire business in the fairly recent past, in an arms-length transaction between sophisticated individuals, is considered practically conclusive evidence of value as of the time of the sale." Hamilton, *supra*, § 11.8.1. We find that the evidence is sufficient to sustain the award of punitive damages. As previously indicated, *supra* at 336, 342, 627 *A.*2d at 1085, 1087, we have not reviewed the amount of the award for excessiveness.

The judgment of the Appellate Division is reversed and the judgment of the Law Division is reinstated.

*For reversal and reinstatement*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.