**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2542-19

REBECCA MCCARTHY,

    Plaintiff-Respondent,

v.

CARE ONE MANAGEMENT,
LLC, and ALISON
FITZPATRICK-DURSKI,

    Defendants-Appellants.

_____

Argued May 10, 2021 – Decided July 12, 2021

Before Judges Rothstadt and Mayer.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-8657-16.

Bruce H. Nagel and Thomas P. Scrivo argued the cause for appellants (Nagel Rice, LLP, Fisher & Phillips, LLP, and O'Toole Scrivo, LLC, attorneys; Bruce H. Nagel, Robert H. Solomon, Brian Gershengorn, and Christopher J. Capone, of counsel and on the briefs; Thomas P. Scrivo, on the brief).

Paul Castronovo and Thomas A. McKinney argued the cause for respondent (Castronovo & McKinney, LLC,

attorneys; Thomas A. McKinney, Paul Castronovo, and
Edward W. Schroll, of counsel and on the brief).

PER CURIAM

A jury found that defendant Care One Management, LLC (Care One) and one of its managers, defendant Alison Fitzpatrick-Durski, violated the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, and it awarded plaintiff Rebecca McCarthy compensatory and punitive damages.[1] The trial court also awarded counsel fees. The total judgment entered against defendants approximated six million dollars.

Defendants appeal from the judgment entered on the verdicts and argue the award of punitive damages must be vacated for several reasons, including the insufficiency of the evidence of liability or damages; the verdict was the result of the jury's confusion or mistake; and the trial court erred by denying their motions for directed verdicts or judgment notwithstanding the verdict (JNOV) or for a new trial and by awarding counsel fees. For the reasons that follow, we affirm the award of compensatory damages, but vacate the award of punitive damages and counsel fees and remand for a new trial on punitive damages only and reconsideration of the counsel fee award.

---

[1] Plaintiff only sought and recovered punitive damages from Care One, not Fitzpatrick-Durski.

## I.

The facts developed at trial leading to Care One's termination of plaintiff's employment are summarized as follows. Plaintiff, a Black woman, holds a Master of Science degree in nursing, is a registered nurse, a board-certified geriatric nurse, a certified director of nursing, and a certified resident assessment coordinator. At the time of trial, she had worked in the nursing field for twenty-three years and served as a nursing director at several facilities. She testified that before Care One terminated her, she planned to work for "something like" ten more years and expected to earn no less than $222,000 annually.

In her complaint, plaintiff alleged that Care One terminated her employment on the basis of her race in violation of the LAD and that Fitzpatrick-Durski aided and abetted Care One's unlawful discrimination. The allegations supporting plaintiff's complaint arose from her employment with Care One in 2016, initially as a Clinical Services Coordinator, and then two months later, after a quick promotion, as a Vice President of Clinical Leadership. Her last salary at Care One was $190,000, with the potential for up to $32,000 in bonuses. Plaintiff remained employed at Care One until November 1, 2016, when she was fired by Fitzpatrick-Durski, who is Caucasian.

A-2542-19

Following her promotion, Care One asked plaintiff to lead the interdisciplinary clinical team at its Somerset Valley facility (SV), a senior living facility that offered assisted living and skilled care and which was not performing well. It assigned plaintiff to help improve customer service and patient count, and to reduce staff turnover. Her direct supervisors were Executive Vice President Elizabeth Straus and Alberto Lugo, who served as Executive Vice President and General Counsel.

In order to address SV's deficiencies, plaintiff intended to develop a program for improvement after she analyzed "what was going on" there. She described the process as "ongoing," and that she continued to assess the situation during her ten-week tenure at SV.

During plaintiff's tenure, she was not disciplined or given notice about any deficiencies in her job performance. According to Matthew Schottlander, SV's administrator, he was satisfied with her performance as she improved overall customer satisfaction, increased the number of patients, and reduced the facility's dependence on nursing staff. According to Guirlande Valcin, the Assistant Director of Nursing, plaintiff "was great" at her job and was "hands-on" in treating patients and addressing problems. In mid-September 2016, Straus sent plaintiff a text message that stated: "Thank you so much for

4

everything!!!!  You have made such a difference and I am so happy you trusted me and decided to stay with us!!  [T]hank you for everything!"

Plaintiff's success was also verified at an October 6, 2016 review by managers of SV's progress.  The review concluded that SV's condition improved since plaintiff's promotion.  Straus and Lugo praised plaintiff for her work.  According to Schottlander, both Straus and Care One's Chief Strategy Officer Timothy Hodges were satisfied with plaintiff's job performance and "happy that clinically things were heading in the right direction."

Despite those accolades, one day after Fitzpatrick-Durski began her assignment at SV, she fired plaintiff.  Fitzpatrick-Durski began working at SV on or around October 31, 2016, and served as Interim Administrator, responsible for enforcing Care One's anti-discrimination policy, and had the authority to hire and fire employees.  She first met plaintiff when she attended the October 6 performance review.

On October 31, 2016,  Fitzpatrick-Durski and plaintiff had a conversation during which no one else was present.  According to plaintiff, Fitzpatrick-Durski asked "[i]n a very demeaning way," whether plaintiff planned on accepting a demotion by resuming plaintiff's former position or some other subordinate position.  Plaintiff did not respond and Fitzpatrick-Durski continued by stating

"I don't want a black person walking around here in a suit as a VP. I want you in scrubs, flats, and a lab coat." Plaintiff asked Fitzpatrick-Durski whether the conversation was over, and then left the room.

Plaintiff did not report the incident to Care One's human resource department even though plaintiff was aware of and received training about Care One's anti-discrimination policy that required her to report discriminatory conduct to human resources, which she could have done anonymously. She explained that she believed Fitzpatrick-Durski was only at SV temporarily, and she did not want to start "causing waves." In addition, plaintiff had recently applied for another promotion and hoped to grow with the company.

Fitzpatrick-Durski, who was also trained on Care One's anti-discrimination policies and procedures, had a different view of what transpired between her and plaintiff. According to Fitzpatrick-Durski, she spoke to plaintiff about a backlog in paperwork at SV, and then told plaintiff that she should perform patient care if she was unwilling to address that backlog. Specifically, Fitzpatrick-Durski said, "[I]f you don't want to do that, maybe you can come in in scrubs and do the treatments and be hands-on care." Fitzpatrick-Durski explained that she wanted plaintiff to wear scrubs because staff felt less intimidated when senior leadership members did not wear business attire.

6

According to Fitzpatrick-Durski, plaintiff did not alleviate all of SV's issues. In mid-October 2016, before Fitzpatrick-Durski arrived at SV, Straus and Lugo allegedly informed Kimberly Komoroski, a Clinical Services Coordinator who was in charge of five other Care One facilities, that SV had "clinical issues," in that physicians, staff, families, and residents were all unhappy with the conditions there. According to Komoroski, who is Caucasian, Straus and Lugo asked her whether she would add SV to the facilities she oversaw. When she eventually took over for plaintiff, Komoroski discovered that accident and incident reports, patient care plans and patient grievances were not only backlogged but were never even investigated.

According to Fitzpatrick-Durski, plaintiff failed to address the problems at SV that she was assigned to remedy, explaining that the facility had months of backlogs for grievance, accident, and incident reports, and that plaintiff was unable to address even the recent reports, let alone the older ones. She stated that plaintiff was unable to present any plan to her regarding either the backlog or resident care and safety. However, she, Komoroski, and the rest of the interdisciplinary team were able to "address[] everything" and eliminate the backlog in approximately one week.

Prior to firing plaintiff, Fitzpatrick-Durski informed Lugo, Vice President of Human Resources Maureen Montegari, and Jean Joseph, the Regional Director of Operations, that she decided to terminate plaintiff's employment. Thereafter, at a meeting attended by Montegari and Byron Wilson, Fitzpatrick-Durski's Administrator-in-Training, she presented plaintiff with a termination letter that noted "[r]ecent examples of poor performance," including "failure to (i) hold staff accountable for performance issues; (ii) identify and remedy operational and staffing issues impacting resident care; and (iii) follow through on expectations identified by senior management, e.g., incident/accident reports and outstanding grievances." Afterward, on November 5, 2016, Komoroski began performing the same duties at SV as plaintiff, although it was not clear whether Care One "replaced" plaintiff with Komoroski or merely asked Komoroski to add plaintiff's former duties to her own.

Fitzpatrick-Durski acknowledged that plaintiff's alleged performance deficiencies were part of a team effort, but no other members of the team were fired or disciplined and that the company did not fire or discipline the employee who was responsible for responding to customer grievances, nor the employees who were responsible for accident and incident reports. According to Fitzpatrick-Durski, Schottlander struggled in performing his duties of

8

overseeing the SV facility and failed to make progress. She did not have the authority to fire him, but she, along with his immediate supervisor, arranged for Schottlander's demotion and transfer.

According to Valcin, who is Black, Fitzpatrick-Durski "was not comfortable talking to" her and would "go around" her to consult with a Caucasian coworker, though she denied that Fitzpatrick-Durski treated her differently because of her race. However, shortly after Fitzpatrick-Durski fired plaintiff, she heard Fitzpatrick-Durski refer to her administrative assistant Wilson, who is also Black, saying "this is my slave." According to Valcin, only she, Fitzpatrick-Durski and Wilson were present for that conversation. Valcin did not respond to Fitzpatrick-Durski or report the incident. Valcin later resigned to take another job after learning that Care One sought to replace her and posted an opening for her position.

Fitzpatrick-Durski denied that she made the comment to Wilson. Wilson also denied that Fitzpatrick-Durski ever called him a "slave." According to Fitzpatrick-Durski, she assigned Wilson to be her administrator-in-training and that she mentored him for the role, which required 1,750 hours of mentorship.

Fitzpatrick-Durski also explained that there were four employees whom she hired or promoted who reported directly to her and were Black, Puerto

Rican, Korean or Filipino, and none ever complained to her about racially insensitive comments she made. In addition, Toya Casper Cornelius, Care One's Chief Clinical Officer, knew that Fitzpatrick-Durski promoted several Black employees during her time with Care One, and that no employees ever told Cornelius that Fitzpatrick-Durski made racially derogatory comments.

After her termination, plaintiff made numerous unsuccessful efforts to seek employment. She never found the same type of employment or income level. Eventually, she began consulting and teaching, earning approximately $129,000 in 2017 and $55,000 from consulting in 2018.

On December 9, 2016, plaintiff filed her complaint. The trial began on October 21, 2019. After plaintiff rested, defendants moved for involuntary dismissal of her punitive damages claim, which the court denied. After defendants rested and the parties presented their closing arguments, defendants moved for judgment under Rule 4:40-1 and to dismiss plaintiff's demand for economic damages based upon her alleged failure to mitigate. The court denied both motions.

On October 30, 2019, the jury returned a verdict in plaintiff's favor in the amount of $1,872,630 as compensatory damages. Defendants renewed their

motion to dismiss plaintiff's demand for punitive damages, which the court again denied.

The jury then considered plaintiff's claim for punitive damages on November 1, 2019, before awarding her $4,127,370 in punitive damages. On November 21, 2019, defendants moved for JNOV or, in the alternative, for a new trial, which the court denied.

On January 14, 2020, the trial court entered a final judgment, in accordance with the jury's findings, awarding plaintiff $455,350 against both defendants for past lost earnings; $1,412,280 against both defendants for future lost earnings; $5,000 against both defendants for emotional distress; $4,127,370 against Care One in punitive damages; $410,980 in attorneys' fees; $22,815 in additional fees for opposing defendants' trial motions; $6,905 in pre-judgment interest at a 0.5% rate; and $88.50 per day in post-judgment interest at a 0.5% rate. This appeal followed.

## II.

### A.

We begin our review by considering defendants' challenges to the jury's verdict on liability and compensatory damages. The challenges that defendants raised before the trial court were contained in their motions for directed verdicts

11

under Rule 4:37-2(b), motions for judgments under Rule 4:40-1 and for judgment notwithstanding the verdict (JNOV) under Rule 4:40-2. Rule 4:37-2(b) allows the defendant to move for dismissal of the action or any claim after the plaintiff rests and "shall be denied if the evidence, together with the legitimate inferences therefrom, could sustain a judgment in [the] plaintiff's favor." The standards under that rule and Rule 4:40-2 for JNOV are identical. Velazquez v. Jiminez, 336 N.J. Super. 10, 30 (App. Div. 2000).

Motions under Rule 4:37-2(b) and Rule 4:40 require the court to deny the motions if reasonable minds could differ after "accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can be reasonably and legitimately deduced therefrom . . . ." Smith v. Millville Rescue Squad, 225 N.J. 373, 397 (2016) (quoting Verdicchio v. Ricca, 179 N.J. 1, 30 (2004)). The court should only grant the motions where no rational juror could find that the plaintiff made a prima facie case of the cause of action. Ibid. We review de novo a trial court's decision on these motions, applying the same standard as the trial court. Ibid.

B.

After the jury returned its verdict, the court denied defendants' motion for JNOV or for a new trial because it concluded the record contained sufficient evidence for a jury to find that Fitzpatrick-Durski acted with malice. Specifically, it found that Fitzpatrick-Durski terminated plaintiff by utilizing the "contrived basis" of poor performance in order to cover up for her racist remarks.

Defendants contend that the court erred in denying their motion for JNOV or a new trial because plaintiff admitted Fitzpatrick-Durski was not a racist who fired her with a discriminatory motive, and plaintiff's theory that Fitzpatrick-Durski fired plaintiff to protect her own job after making a racially insensitive remark had no support in the record. They also contend that plaintiff's admission demonstrates that Fitzpatrick-Durski's stated reason for terminating plaintiff--plaintiff's alleged poor job performance--was not a pretext for Fitzpatrick-Durski's discriminatory intent.

In his closing argument, plaintiff's counsel outlined plaintiff's theory that Fitzpatrick-Durski terminated plaintiff's employment in order to protect her own job after plaintiff took offense to Fitzpatrick-Durski's racist remarks. Counsel stated:

> This comment is made, there's a reaction, and [Fitzpatrick-Durski], to protect her job, terminates

13

[plaintiff] the next day. And that's what gets you to race discrimination. Because that, when you look at it, is based on race. If [plaintiff] was not a black woman . . . [t]hat comment's [sic] never going to happen . . . And [Fitzpatrick-Durski] is never going to terminate her for it. . . .

This isn't a case where we're saying that [Fitzpatrick-Durski is] a racist. We've never said that. We don't have to prove that. We have to prove that [plaintiff] was terminated because of her race. That that was something that motivated it. There's no doubt that she has friends that are black, but we're not claiming that in any way.

But she makes bizarre comments. Very bizarre comments. . . .

Counsel went on to state that Fitzpatrick-Durski terminated plaintiff's employment the day after the alleged remarks because Fitzpatrick-Durski "needed to protect herself. She needed to protect her job because she was scared of what [plaintiff] might do."

Later, the trial court denied defendants' motion because plaintiff demonstrated by a preponderance of evidence that defendants terminated her based on race, she was a member of a protected class, defendants never complained about her performance, and they replaced her with a Caucasian woman. The court held that plaintiff presented sufficient evidence to show defendants' claim that they terminated her for poor performance was pretextual,

as she presented evidence that the facility improved under her leadership, defendants presented no documentary evidence to support that she performed poorly, and plaintiff presented proofs that Fitzpatrick-Durski made racially insensitive remarks. The court noted that the matter hinged on credibility, and the jury made a credibility determination in plaintiff's favor.

The trial court's analysis was consistent with the framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973), as adopted in New Jersey, for determining whether members of protected classes were subject to unlawful discrimination under the LAD. Gerety v. Atl. City Hilton Casino Resort, 184 N.J. 391, 399 (2005). Under that framework, a plaintiff satisfies her burden of establishing a prima facie case of unlawful discrimination by proving that she is a member of a protected class, she performed her job at a level that met her employer's legitimate expectations, her employer terminated her, and the employer subsequently hired someone else to perform the same work. DeWees v. RCN Corp., 380 N.J. Super. 511, 523 (App. Div. 2005).

The defendant then must produce a legitimate, nondiscriminatory reason for the adverse employment action, after which the plaintiff must prove that the reason was a pretext for discrimination, rather than the true reason for the termination. Id. at 523-24. "To prove pretext . . . a plaintiff must do more than

simply show that the employer's reason was false; he or she must also demonstrate that the employer was motivated by discriminatory intent." Visick v. Fowler Equip. Co., 173 N.J. 1, 14 (2002).

The plaintiff need not provide direct evidence, but "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" Kolb v. Burns, 320 N.J. Super. 467, 478 (App. Div. 1999) (alteration in original) (quoting Fuentes v. Perksie, 32 F.3d 759, 765 (3d Cir. 1994)). "The burden of proof . . . remains with the employee at all times." Zive v. Stanley Roberts, Inc., 182 N.J. 436, 450 (2005).

Here, the trial court appropriately noted that plaintiff's case depended primarily on witness credibility, and correctly stated that its mission in ruling on the motions was not to weigh the evidence or determine credibility, but to determine whether reasonable minds could differ after accepting as true all evidence that supports plaintiff's position. See, e.g., Baxter v. Fairmont Food Co., 74 N.J. 588, 597-98 (1977) (a court should not substitute its judgment for that of jury on motion for new trial but act only to correct jury's clear error or

mistake); <u>Dolson v. Anastasia</u>, 55 N.J. 2, 5-6 (1969) (a court's function on motion for JNOV is "quite a mechanical one," as a court denies motion if reasonable minds could differ); <u>Alves v. Rosenberg</u>, 400 N.J. Super. 553, 565-66 (App. Div. 2008) (a court should ordinarily deny motions under <u>Rule</u> 4:40 when material facts rest upon credibility).

The outcome of the matter hinged upon witness credibility as the parties' witnesses often gave sharply opposing testimony, particularly plaintiff and Fitzpatrick-Durski, about the critical issue of Fitzpatrick-Durski's racist comments. The jury determined that the evidence was in plaintiff's favor, and the court appropriately found that there was sufficient evidence for a reasonable jury to find in her favor and for its verdict not to constitute a miscarriage of justice.

We agree that the record contains sufficient evidence of defendants' unlawful discrimination that was needed for plaintiff to establish a prima facie case. She was a Black woman whom defendants terminated, and there was evidence in the record that they replaced her with Komoroski, a Caucasian woman. The record also contains substantial evidence that plaintiff performed her duties in a manner that met defendants' reasonable expectations.

While Fitzpatrick-Durski testified that she terminated plaintiff for the legitimate, nondiscriminatory reason of poor performance, the record strongly suggests that this reason was pretextual and that Fitzpatrick-Durski's actual motivation was discriminatory. The record contains testimony that Fitzpatrick-Durski made racist statements to plaintiff and Wilson, that Fitzpatrick-Durski was uncomfortable around Valcin and avoided speaking with her, and that Fitzpatrick-Durski wanted plaintiff to wear scrubs.[2] In addition, Fitzpatrick-

---

[2] Recently, our Supreme Court addressed a hostile work environment claim under the LAD where a supervisor made two racist comments about Hispanics. Responding to arguments that the two comments were insufficient to support the Hispanic employee's claim, the Court stated the following:

> [The defendant's] position as a supervisor compounded the severity of the alleged remarks. [The Court previously] emphasized the overarching responsibilities of a supervisor to prevent and put an end to racial harassment in the workplace. . . . Direct supervisors also routinely work closely with employees they supervise and evaluate their performance. In that and other ways, a person's direct supervisor often has a say in the individual's future with the organization -- even if the supervisor is not a top-ranking official.
> Here, [defendant] had interviewed [plaintiff] for his position with the company only weeks before the alleged comments were made.
>
> Under those circumstances, comments like the ones alleged, viewed from the perspective of a reasonable

Durski fired plaintiff the day after she made the racist remarks, and plaintiff was the only one on the SV team who was terminated or even disciplined. Further, defendants produced no documentary evidence of plaintiff's alleged poor performance.

Defendants argue that plaintiff's counsel's statement in summation that he "never said" "that [Fitzpatrick-Durski is] a racist" proves that Fitzpatrick-Durski did not terminate plaintiff due to a discriminatory motive. However, this argument takes the summation out of context--counsel argued that plaintiff was not required to prove that Fitzpatrick-Durski harbors deep-seated racial animus to prove that Fitzpatrick-Durski terminated plaintiff because of her race. Further, regardless of the attorney's statement, the record contained sufficient evidence for the jury to find that plaintiff satisfied her burden. On this basis, defendants' motions were properly denied.

C.

Next, defendants contend that the judgment against Fitzpatrick-Durski must be vacated because plaintiff's complaint alleged that she aided and abetted

---

Hispanic employee, could taint every interaction that followed between an employee and a direct supervisor.

[Rios v. Meda Pharm., Inc., __ N.J. __, __ (2021) (slip op. at 17).]

Care One as defined under the LAD, but there was no underlying LAD violation for anyone to aid or abet. The trial court denied defendants' motion for JNOV because plaintiff presented sufficient evidence for a rational jury to find not only that defendants committed an LAD violation, but that the conduct was sufficiently egregious and malicious to sustain a punitive damages verdict. We find no error in the trial court's determination.

Under N.J.S.A. 10:5-12(e) it is unlawful discrimination "[f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under [the LAD], or to attempt to do so." "New Jersey courts have held that an individual can aid and abet, not only the conduct of another person, but that person's own conduct. That implies the availability of personal liability for a violation of the [LAD]." DeSantis v. N.J. Transit, 103 F. Supp. 3d 583, 591 (D.N.J. 2015) (citing Cicchetti v. Morris Cnty. Sheriff's Office, 194 N.J. 563, 594 (2008)).

> [I]n order to hold an employee liable as an aider or abettor, a plaintiff must show that "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of [her] role as part of an overall illegal or tortious activity at the time that [she] provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation."

A-2542-19

> [Tarr v. Ciasulli, 181 N.J. 70, 84 (2004) (quoting Hurley v. Atl. City Police Dep't, 174 F.3d 95, 127 (3d Cir. 1999)).]

When determining whether a defendant substantially assisted the principal violator under the third prong, a court should consider: "(1) the nature of the act encouraged, (2) the amount of assistance given by the supervisor, (3) whether the supervisor was present at the time of the asserted harassment, (4) the supervisor's relations to the others, and (5) the state of mind of the supervisor." Ibid.

In Cicchetti, the Court explained that "individual liability of a supervisor for acts of discrimination or for creating or maintaining a hostile environment can only arise through the 'aiding and abetting' mechanism that applies to 'any person.'" 194 N.J. at 594 (emphasis added) (quoting N.J.S.A. 10:5-12(e)).

Applying the three prongs from Tarr, first, the record contains evidence that Care One, the party that Fitzpatrick-Durski aided through her conduct, performed a wrongful act--firing plaintiff on the basis of her race. That Fitzpatrick-Durski herself fired plaintiff does not relieve her from personal liability under the aiding or abetting theory. To the contrary, that she personally carried out the adverse employment action is precisely the reason she can be held liable under the LAD's aiding and abetting mechanism. Ibid. Second, she

21

was aware that she was part of the illegal or tortious activity, in that she unlawfully terminated plaintiff to avoid negative consequences for making racist statements.

Finally, the record also contains evidence that she knowingly and substantially assisted the violation in that she was trained on the company's policy, made the offensive statements, and then decided to fire plaintiff, giving rise to the LAD violation. Under this prong, the "amount of assistance given by the supervisor," and "whether the supervisor was present" are factors that clearly establish Fitzpatrick-Durski substantially assisted in the violation. Again, she was the one who committed the violation. Accordingly, the record contains sufficient evidence that Fitzpatrick-Durski qualified as an aider or abettor.

D.

We turn our attention to defendants' arguments about the sufficiency of plaintiff's proofs about her compensatory damages. According to defendants, the trial court erred by denying their motions to dismiss plaintiff's demand for economic damages and for JNOV because she failed to demonstrate a continuing effort to obtain substantially equivalent employment. They also contend that she was not entitled to back pay and that she failed to provide evidence of her 2019 income. As to the front pay award, defendants argue that the jury awarded

more than she requested based upon speculative evidence and the award amount demonstrated that the jury was mistaken or confused. We find no merit to these contentions.

After the parties rested, and before the jury returned its verdict, the trial court denied defendants' motion to dismiss plaintiff's demand for economic damages because the record contained sufficient efforts by plaintiff to mitigate damages for the jury to consider the issue. The court later denied defendants' motions for JNOV, or for a new trial, for the same reason. The court noted that defendants had the burden of demonstrating that plaintiff's mitigation efforts were inadequate, and they relied only on their cross-examination of plaintiff and brief testimony of Cornelius regarding available positions, rather than expert testimony. The court denied defendants' motion because plaintiff presented sufficient evidence of her lost income and inability to earn a similar income to sustain her burden. We agree with the trial court.

A defendant in an employment discrimination case bears the burden of proof as to whether the plaintiff satisfied her duty to mitigate past losses, such as back pay. Quinlan v. Curtiss-Wright Corp., 425 N.J. Super. 335, 360-62 (App. Div. 2012). While "[m]itigation depends upon the facts of the case," relevant factors include whether jobs are available, whether the plaintiff "made

a reasonable and diligent effort to obtain" employment, and the nature of the other jobs available. <u>Goodman v. London Metals Exch., Inc.</u>, 86 N.J. 19, 36-37 (1981).

Here, the record reflects that plaintiff applied for jobs in the healthcare field after defendants fired her, worked with recruiters, posted her resume on job sites, and had "always worked" since she was terminated. Defendants correctly note that she did not apply for director of nursing positions and that Cornelius testified that the job market for such positions was good. However, because the record does not contain the salaries for the positions that plaintiff applied for, defendants did not demonstrate that she applied for positions that offered less income than that which she earned with them or less than she would have earned as a director of nursing. The evidence of plaintiff's efforts to mitigate, together with the legitimate inferences therefrom, were sufficient to sustain a judgment in plaintiff's favor.

So too was the evidence about back pay, which defendants challenged in their <u>Rule</u> 4:49-1(a) motion for a new trial. Such motions are granted only if the record clearly and convincingly establishes a miscarriage of justice under the law. "[T]he evaluation of damages is a matter uniquely reposed in the jury's good judgment and to justify judicial interference, the verdict must be wide of

the mark and pervaded by a sense of wrongness." Ogborne v. Mercer Cemetery Corp., 197 N.J. 448, 463 (2009) (quoting Jastram ex rel. Jastram v. Kruse, 197 N.J. 216, 229 (2008)). "[A] 'miscarriage of justice' can arise when there is a 'manifest lack of inherently credible evidence to support the finding,' when there has been an 'obvious overlooking or under-valuation of crucial evidence,' or when the case culminates in a 'clearly unjust result.'" Hayes v. Delamotte, 231 N.J. 373, 386 (2018) (quoting Risko v. Thompson Mueller Auto. Grp., Inc., 206 N.J. 506, 521-22 (2011)).

Under Rule 2:10-1, the issue of whether a jury verdict was against the weight of the evidence is cognizable on appeal where the appellant moved in the trial court for a new trial, and "[t]he trial court's ruling . . . shall not be reversed unless it clearly appears that there was a miscarriage of justice under the law." In reviewing these determinations, we apply the same standard as the trial court, Hayes, 231 N.J. at 386, and never "disturb the findings of the jury merely because [we] would have found otherwise upon review of the same evidence." Delvecchio v. Twp. of Bridgewater, 224 N.J. 559, 572 (2016).

A plaintiff in an LAD case bears the burden of demonstrating her entitlement to both back pay and front pay. Quinlan, 425 N.J. Super. at 360-63. With regard to front pay, she must "prove what she would have earned had she

not suffered the wrong[,] . . . how long she would have continued to receive those earnings, and a reasonable likelihood that she will not be able to earn that amount in the future, such as through alternative employment." Id. at 364.

"Back pay is awarded to make the discriminatee whole by reimbursing the economic loss suffered because of the discrimination." Grasso v. W. N.Y. Bd. of Educ., 364 N.J. Super. 109, 121 (App. Div. 2003) (citing Goodman, 86 N.J. at 34-35). Its purpose is to compensate plaintiffs at the employment status they would have achieved without the unlawful discrimination, and the award must be based on a reasonable method of calculation, as opposed to mathematical certainty. Ibid.

Here, the jury's award of $455,350 in back pay aligns with a reasonable method of calculation to reimburse plaintiff for her economic loss. Defendants terminated plaintiff almost exactly three years before the jury returned its verdict. If plaintiff had continued to work for three years and earn her salary and full bonus ($190,000 and $32,000, respectively), she would have earned a total of $666,000. When her 2017 income of $129,000 and $55,000 in 2018 income are subtracted, this results in damages of $482,000. While the record does not reflect how the jury arrived at its figure, it compensated her at

approximately the employment status she would have achieved without the unlawful discrimination it found that defendants committed.

Plaintiff also presented sufficient evidence to satisfy her burden of proving that she was entitled to front pay. She demonstrated her income at Care One through her testimony and offer letter, as well as her income after her termination through her testimony and tax returns. She submitted evidence regarding the length of time that she would have continued to receive her Care One earnings by testifying that she planned to work an additional ten years or so. It is worth noting that her tentative plans to retire relatively early served to reduce defendants' liability because plaintiff's early retirement would reduce her potential lost earnings. Plaintiff also submitted evidence that she would not be able to earn her Care One income in the future by testifying that she did not receive offers from the jobs she applied to, testifying as to her reduced earnings, and testifying that the termination negatively impacted her reputation in the industry.

The jury's award of $1,412,280 in future lost earnings was reasonable in light of the evidence. If plaintiff continued to work for ten years after trial and earned her salary and full bonus, she would have earned a total of $2.22 million. The jury reduced this amount by $807,720, or an annual average of $80,772.

27

The latter figure is near the average of her 2017 and 2018 incomes. The jury's verdict was not wide of the mark and did not reflect a miscarriage of justice. We have no cause to disturb the result.

III.

Having determined plaintiff established defendants' liability and her compensatory damages, we turn to defendant's challenges to the punitive damage award. On appeal, they argue that we should vacate the jury's punitive damages award because: (1) the evidence failed to demonstrate clearly and convincingly that they engaged in especially egregious conduct; (2) Care One cannot be vicariously liable for Fitzpatrick-Durski's conduct; (3) plaintiff failed to provide the jury with any information regarding Care One's financial condition; (4) the trial court failed to make required findings regarding the reasonableness of the award; and (5) plaintiff's closing argument was highly prejudicial.

A.

We first address the sufficiency of the evidence. After plaintiff rested in the liability phase, the trial court denied defendants' motion to dismiss plaintiff's punitive damages claim because it rested upon the credibility of witnesses, and plaintiff raised more than a scintilla of evidence to support her claim. After the

jury returned its verdict, and before the punitive damages phase, defendants renewed their motion, which the court denied for the same reasons.

Prior to the commencement of the punitive damage phase, on October 30, 2019, plaintiff's counsel raised issues about his attempt to secure financial information from Care One. He stated that he asked for Care One's profit and loss statements, balance sheets, and cash flow statements. However, Care One provided only a document that was later marked as P-38 in evidence, which was a one-page profit-and-loss statement from 2016 through September 2019, along with a certification from Care One's tax manager, who certified that it was a true and correct copy. The statement showed that Care One had approximately $42.5 million in net revenue and $2.5 million in net income in 2018, and $30.6 million in net revenue with a $3.1 million loss as of September 2019.

Plaintiff's counsel argued that the information provided was not sufficient as it was undisputed that Care One was one of multiple interrelated entities for which defendants provided no financial information. Defendants' counsel represented that Care One provided management services to the other entities and was plaintiff's employer, while Care One, LLC, was a holding company for various entities and did not employ anyone. Plaintiff's counsel argued that plaintiff was entitled to the financial information of Care One, LLC if defendants

were unwilling to stipulate to its revenue because Care One was merely a pass-through entity.

At first, the trial court determined that it would be fair for plaintiff to submit to the jury that Care One had a relationship with the other entities, noting the time constraints they were under and explaining that they could not continue discovery or obtain depositions because they had a jury that had been there for two weeks already. The trial court later reversed that decision and ultimately found that N.J.S.A. 2A:15-5.12(c)(4) referenced the financial condition of the "tortfeasor," and the tortfeasor in the matter before it was Care One, not Care One, LLC, which was not named in the complaint. As such, plaintiff could introduce only P-38 into evidence regarding Care One's finances, and her attorney could not inform the jurors during closing argument that Care One was part of a larger network of companies in order to make any suggestions about its financial condition.

Thereafter, plaintiff did not present any evidence during the punitive damage phase as to either Care One or Care One LLC's financial condition. Plaintiff's counsel did not mention P-38 in his argument to the jury and it never received P-38 when it retired to deliberate.

B.

Punitive damages awards in an LAD action are governed by both the LAD and the Punitive Damages Act (PDA), N.J.S.A. 2A:15-5.9 to -5.17, and should only be awarded in exceptional cases where the defendant exhibited "wanton or reckless conduct," Saffos v. Avaya Inc., 419 N.J. Super. 244, 262-63 (App. Div. 2011) (quoting Catalane v. Gilian Instrument Corp., 271 N.J. Super. 476, 501 (App. Div. 1994)), which "[was] especially egregious." Rendine v. Pantzer, 141 N.J. 292, 314 (1995). Punitive damages are only to be awarded in exceptional cases even where the LAD has been violated. Weiss v. Parker Hannifan Corp., 747 F. Supp. 1118, 1135 (D.N.J. 1990) (citing Gray v. Serruto Builders, Inc., 110 N.J. Super. 297, 319 (Ch. Div. 1970)); see also DiGiovanni v. Pessel, 55 N.J. 188, 190 (1970) ("Something more than the mere commission of a tort is always required for punitive damages." (quoting Prosser on Torts § 2 (2d ed. 1955))).

In Aguas v. State, 220 N.J. 494 (2015), the Court addressed an LAD claim against a public employer and explained the relationship between the LAD and PDA. It stated the PDA's "statutory cap" did not apply to LAD claims, but "the PDA's 'general requirements for procedural and substantive fairness are

31

mandated.'" Id. at 530 (quoting Baker v. Nat'l State Bank, 161 N.J. 220, 229 (1999)).

With these guiding principles in mind, we turn first to defendants' argument that the evidence at trial about Fitzpatrick-Durski's single statement to plaintiff failed to "clearly and convincingly" establish their conduct was sufficiently egregious to warrant an award of punitive damages. We disagree.

First, "[t]he key to the right to punitive damages is the wrongfulness of the intentional act." Saffos, 419 N.J. Super. at 263 (quoting Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 49 (1984)). Actions by an LAD defendant "involving 'trickery and deceit'" satisfy that requirement and justify an award of punitive damages. Baker v. Nat'l State Bank, 353 N.J. Super. 145, 155-56 (App. Div. 2002). Such actions include a defendant's fabrication of legitimate reasons to terminate a plaintiff to justify a discrimination based firing. Id. at 156.

Second, an award of punitive damages is justified where there is proof of "actual participation in or willful indifference to the wrongful conduct on the part of upper management," which includes both executive officers and "second tier" managers who have broad supervisory powers, including those to hire, fire

32

and discipline employees. Cavuoti v. N.J. Transit Corp., 161 N.J. 107, 113, 128-29 (1999).

Proof of actions supporting a punitive damage award must be clear and convincing, meaning the evidence "should produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." State v. Hernandez, 334 N.J. Super. 264, 271 (App. Div. 2000) (quoting In re Purrazzella, 134 N.J. 228, 240 (1993)). In other words, "it is evidence that is 'so clear, direct and weighty and convincing as to enable either a judge or jury [the factfinder] to come to a clear conviction, without hesitancy, of the precise facts in issue.'" Ibid. (quoting In re Seaman, 133 N.J. 67, 74 (1993)).

Direct testimony can qualify as clear and convincing evidence. Ibid. Contrary to defendants' assertion on appeal, direct evidence that is disputed or contradicted or limited in quantity does not necessarily prevent a rational jury from relying on it based on its credibility determinations.

Here, we conclude that the trial court correctly decided the subject motions by accepting as true all evidence that supported plaintiff's position--that Fitzpatrick-Durski made two racist and demeaning comments to plaintiff, that she made a racist comment to Wilson, that she was not fully comfortable

interacting with Valcin, and that she terminated plaintiff to protect her own job after making the offensive comments. A rational jury could find that Fitzpatrick-Durski's comments were malicious and egregious and that terminating plaintiff utilizing plaintiff's alleged poor performance as a pretext is the sort of "trickery and deceit" that supports an award of punitive damages.

C.

Next, we address Care One's contention that it could not be held liable for punitive damages based upon Fitzpatrick-Durski's conduct because it maintained an anti-discrimination policy and had procedures in place to prevent discrimination and to address any alleged violations. In advancing this argument, Care One disagrees with the trial court's conclusion that plaintiff satisfied her burden if she proved participation in, or indifference to, tortious conduct by upper management, that Fitzpatrick-Durski was part of Care One's upper management, and that the record contained clear and convincing evidence of Fitzpatrick-Durski's egregious conduct. According to Care One, the Cavuoti Court held, pursuant to Kolstad v. ADA, 527 U.S. 526 (1998), that employers cannot be held vicariously liable for discriminatory actions of employees-- including managerial employees--that the employer specifically forbade. We reach a different conclusion.

In order to succeed on a claim for punitive damages under the LAD against an employer, the plaintiff must demonstrate actual participation in, or willful indifference to, the wrongful conduct on the part of "upper management," which includes both executive officers and "second tier" managers. Cavuoti, 161 N.J. at 113, 128-29. Here, Fitzpatrick-Durski was an upper manager as she was responsible for enforcing Care One's anti-discrimination policy in her position as Interim Administrator and had the authority to hire and fire employees. Defendants do not contest her categorization as either an upper manager or second tier manager.

Contrary to Care One's contention, the Cavuoti Court held that employers could be held liable for punitive damages under the LAD when a member of the employer's upper management was involved in the wrongful conduct. Id. at 116-18. Applying that holding here, the evidence of Care One's permitting Fitzpatrick-Durski, a member of upper management who made racist remarks to plaintiff before terminating her, to cover up her conduct by firing plaintiff for alleged deficient performance satisfied the requirement for holding Care One liable for punitive damages for a member of upper management's discriminatory behavior.

D.

Having determined that an award of punitive damages against Care One was warranted, we turn to defendants' contention that the trial court erred by denying their motions because the jury rendered its verdict without any information as to defendants' financial condition as required by N.J.S.A. 2A:15-5.12(c)(2) and -5.12(c)(4). Because defendants did not raise this issue before the trial court, we review the matter under our plain error standard, see R. 2:10-2 ("Any error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result . . . ."), and conclude that the award of punitive damages must be vacated and remanded for a new trial.

Once a plaintiff proves by clear and convincing evidence that she is entitled to an award of punitive damages, the jury is then instructed to consider the factors set forth in N.J.S.A. 2A:15-5.12(c), which states the following:

> If the trier of fact determines that punitive damages should be awarded, the trier of fact shall then determine the amount of those damages. In making that determination, the trier of fact shall consider all relevant evidence, including, but not limited to, the following:

(1) All relevant evidence relating to the factors set forth in subsection b[3] of this section;

(2) The profitability of the misconduct to the defendant;

(3) When the misconduct was terminated; and

(4) The financial condition of the defendant.

In <u>McDonough v. Jorda</u>, 214 N.J. Super. 338, 348-49 (App. Div. 1986), we vacated a punitive damages award and ordered a new trial as to damages

---

[3] Subsection (b) states the following:

> b. In determining whether punitive damages are to be awarded, the trier of fact shall consider all relevant evidence, including but not limited to, the following:
>
> (1) The likelihood, at the relevant time, that serious harm would arise from the defendant's conduct;
>
> (2) The defendant's awareness of reckless disregard of the likelihood that the serious harm at issue would arise from the defendant's conduct;
>
> (3) The conduct of the defendant upon learning that its initial conduct would likely cause harm; and
>
> (4) The duration of the conduct or any concealment of it by the defendant.
>
> [N.J.S.A. 2A:15-5.12(b).]

because, among other issues, the victim failed to present the jury with any evidence regarding the tortfeasors' ability to pay an award. We held that such evidence was an "essential" element of the victim's burden of proof, and the failure to offer any evidence as to that element "precluded the jury from having a proper foundation to assess damages." Id. at 349. We explained, "[t]his is so because the theory behind punitive damages is to punish for the past event and to prevent future offenses, and the degree of punishment resulting from a judgment must be, to some extent, in proportion to the means of the guilty person." Ibid.

Discovery of a defendant's financial condition must be allowed, but only after the plaintiff "establish[es] a prima facie case of the right to recover punitive damages." Herman v. Sunshine Chem. Specialties Inc., 133 N.J. 329, 344 (1993). "'[F]inancial condition' means the 'defendant's ability to pay'" a punitive damages award. Tarr v. Bob Ciasulli's Mack Auto Mall, Inc., 194 N.J. 212, 219 (2008). A defendant's "ability to pay . . . does not necessarily equate with net worth. Depending on the facts of a case, a defendant's income might be a better indicator of the ability to pay." Herman, 133 N.J. at 345.

Where a plaintiff does not introduce any evidence of a defendant's financial condition and the defendant does not move to dismiss before the trial

court based on that deficiency, a jury can rely upon information adduced during the case in chief. Id. at 343, 346. In Herman, a products liability case, the Court described the testimony on cross-examination of the defendant's president about his company's financial condition before concluding that "although not overwhelming, [it was] sufficient to support an award of punitive damages." Id. at 346. There the Court stated the following:

> In this case, the cross-examination of Sunshine's president revealed that Sun-Clean was Sunshine's best-selling product, accounting for approximately one-third of the company's gross sales of $3 million. [The president] also testified that in 1986, when Sunshine's gross sales had grown to $3.5 million, he and his wife sold 100% of Sunshine's stock for $750,000. That evidence, although not overwhelming, is sufficient to support an award of punitive damages. Although the jury did not know of the net profit from the sale of Sun-Clean, it knew the gross sales figures for both the product and the company. It also knew that [the president] had sold 100% of the stock of the corporation for $750,000. "A sale of the entire business in the fairly recent past, in an arms-length transaction between sophisticated individuals, is considered practically conclusive evidence of value as of the time of the sale." . . . We find that the evidence is sufficient to sustain the award of punitive damages.
>
> [Ibid.]

In the instant matter, the jury assessed punitive damages of $4,127,370 against Care One without the benefit of any evidence regarding Care One's

financial condition. Plaintiff argued before the trial court that she required additional documents from Care One, including its balance sheets and cash flow statements, as well documents and information regarding Care One, LLC. Instead of allowing for that discovery, the trial court not only deprived plaintiff the opportunity, but it also left the jury without information to decide the issue. Although the court allowed counsel to use P-38, it was never given to the jury and plaintiff's counsel did not refer to or mention the financials provided in P-38. The jury determined the damage amount therefore without any evidence of Care One's financial condition.

Moreover, while plaintiff contended in her argument before us that there was information about Care One's or Care One LLC's payroll presented during the liability phase, we cannot conclude that was sufficient information upon which a jury could determine Care One's financial condition. It simply was not enough. Under these circumstances, the award must be vacated and a new trial as to punitive damages must be conducted after an opportunity for discovery of relevant information. See Tarr, 194 N.J. at 222.

Information regarding the financial condition of Care One, LLC is not relevant to plaintiff's claim of punitive damages unless she establishes a basis for the production of such information that is more compelling than its

40

ownership and control of Care One. Generally, the wealth of a parent corporation is irrelevant to the jury's assessment of the appropriateness of punitive damages. See Herman v. Hess Oil V.I. Corp., 379 F. Supp. 1268, 1276 (D.V.I. 1974), aff'd 524 F.2d 767, 772 (3d Cir.1975) ("[T]he size of [a defendant's] parent company should not be relevant when assessing damages against [defendant].").

If the jury on remand awards punitive damages, the trial court is obligated to make findings consistent with Rule 1:7-4 about the award's reasonableness as required by N.J.S.A. 2A:15-5.14(a). That statute states in pertinent part, "the trial judge shall ascertain that the award is reasonable in its amount and justified in the circumstances of the case, in light of the purpose to punish the defendant and to deter that defendant from repeating such conduct," and authorizes the court to "reduce . . . or eliminate the award" if appropriate. See Curzi v. Raub, 415 N.J. Super. 1, 28 (App. Div. 2010) (stating that the statute "gives the judge an affirmative obligation to see that a punitive damages award is reasonable" before he or she enters judgment for the award).

## E.

In light of our conclusion that a new trial as to punitive damages is required, we need not reach defendants' remaining arguments, other than to

direct that the amount of the counsel fee award must also be vacated so that it may be reconsidered after completion of the new trial on punitive damages.

Affirmed in part; vacated and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2542-19